KATE N. DODD, INDIVIDUALLY, AND KATE N. DODD, AS GUARDIAN OF THE ESTATE OF RICHARD RYLAND DODD, INCOMPETENT, APPELLANTS, *v.* PAUL COW-GILL, AS ADMINISTRATOR OF THE ESTATE OF JOSEPH M. PABIS; H. H. PORTER, AS ADMINISTRATOR OF THE ESTATE OF HERBERT E. KIMMEL; C. G. WINKEL, JR., SURVIVING PARTNER OF WINKEL MOTORS, A PARTNERSHIP; AND WINKEL MOTORS, INC., RESPONDENTS.

No. 5761

December 24, 1969 463 P.2d 482

[Rehearing denied January 22, 1970]

*Oliver C. Custer* and *J. Rayner Kjeldsen,* of Reno, for Appellants.

*Streeter, Sala & McAuliffe,* of Reno, for Respondents.

## OPINION

By the Court, MOWBRAY, J.:

Kate M. Dodd, individually and as guardian of her brother, Richard Ryland Dodd, lessors under a master lease agreement dated August 10, 1957, commenced an action on January 20, 1966, in the district court against the estates of the lessees named therein, Joseph M. Pabis and Herbert E. Kimmel, seeking: (1) an injunction restraining the lessees' representative from proceeding with arbitration as provided in the lease; (2) a declaratory judgment to determine the rights of the parties under the lease; (3) damages for an alleged conspiracy between representatives of the lessees and Winkel Motors, Inc., subtenant under the lease, to terminate and cancel the master lease (Winkel Motors, Inc., and its predecessor in interest, Winkel Motors, a partnership, were added as defendants in this count); and (4) damages for loss of rent due under the master lease for the remainder of its term, i.e., through August 31, 1967.

The defendants, who are respondents on this appeal, answered the Dodds' complaint and counterclaimed, asking that, because of Kate's actions, (1) the master lease be declared terminated as of January 1, 1966; (2) the lessees be relieved of all rental and other obligations due after that date; (3) the Dodds return the rent paid by lessees since January 1, 1966; and (4) punitive and exemplary damages be awarded lessees for malicious abuse of process.

The case was tried to the court sitting without a jury. The district judge denied the Dodds' claim in toto, and he specifically found that Kate's actions had in effect canceled the master lease and that the lessees were entitled to damages for (1) rent paid to the Dodds after January 1, 1966; (2) lessees' loss of

profit due from the sublease with Winkel for the remainder of the term of the master lease; (3) $15,000 plus compound interest for the return of a rental security deposit; and (4) $10,000 attorneys' fees.

The Dodds have appealed from the judgment of the district court and seek reversal on the grounds that the lower court erred in (1) dismissing the Dodds' conspiracy count under an NRCP 41(b) motion; (2) denying the Dodds' motion for a continuance of the trial; (3) finding that under the terms of the master lease the Dodds had covenanted to repair the premises and had failed to do so; (4) ruling that the inspection report of the leased premises, made by the chief building inspector of the City of Reno, constituted a final order to repair, or to vacate and demolish, the building on the leased property; (5) deeming admitted the respondents' request for admissions under NRCP 36; (6) finding that Kate's refusal to arbitrate as provided in the lease constituted a breach of the lease; and (7) awarding compound rather than simple interest on the $15,000 security deposit ordered returned to the lessees.

We reject the assigned errors and affirm the judgment of the lower court.

## I. FACTUAL BACKGROUND

Winkel had for many years operated an auto sales agency in Reno at the Tower Building, which they leased from the Dodds. In 1956, Kate desired to be relieved from managing the property. She discussed with her then accountants, Pabis and Kimmel, the feasibility of her executing master leases to them, as lessees, on both the Tower Building and the Ryland Building, located in the same block, and then their subletting the buildings. Pabis and Kimmel were not enthusiastic, but finally agreed to the proposal because they were Kate's accountants. Accordingly, a master lease dated August 5, 1956, effective through August 1, 1966, on the Ryland Building, and a master lease dated August 10, 1957, effective through August 31, 1967, on the Tower Building, were drawn and signed. Pabis and Kimmel sublet the Tower Building to Winkel.

Under the terms of the master leases, Kate agreed she would keep the buildings in repair and that Pabis and Kimmel would net $150 a month (the difference in the rent they paid Kate and that which they received from Winkel) for "managing the property." This arrangement was satisfactory to all the parties until the summer of 1965. Winkel had decided by then to remove its auto agency operation from the Tower Building to a

location on Kietzke Lane in Reno. Because their lease ran until August 31, 1967, Winkel had further decided to sublease the Tower Building to another tenant, if one could be found. The building had deteriorated during the Winkel tenancy.[1] Before the property could be relet, a certificate of occupancy from the City of Reno was required. To that end, William Parish, agent for the Pabis and Kimmel estates, requested an inspection by the City. The inspection was conducted by Ronald Coleman, Chief Building Inspector, and his report, dated September 23, 1965, was submitted to Parish. The report listed no fewer than 23 structural deficiencies and violations of the city code and ordered that the building be "brought up to code," or demolished, within 30 days. The report was sent to Kate by registered mail at her Palo Alto, California, address. Parish notified Kate that Winkel was moving to its new location on Kietzke Lane; that if the Building was not brought up to code so that it would be rentable, Winkel would pay rent only until December 31, 1965; and that in such case the Pabis and Kimmel estates would terminate their lease payments to Kate on that date.

As a result of Parish's letter, a meeting of all the parties was held on December 28, 1965, in Palo Alto. Kate's attorney, Kenneth R. McDougall, was present. A dispute arose as to who should correct the structural deficiencies listed by the city inspector.[2] Kate argued that it was the tenant's duty to do so because the items did not constitute a "major repair" of the property.[3] The respondents then suggested that arbitrators be appointed to determine whether the items to be corrected

[1] The record shows that Winkel had spent approximately $60,000 on remodeling and structural repairs and that Kate had attempted to repair a damaged ramp leading into the building and had tried to patch the cement floor, which was breaking up.

[2] Paragraph 9 of the master lease agreement provided, in part:

"9. . . . Notwithstanding the foregoing provisions of this paragraph 9, Lessee shall not be required to make any structural alterations or structural repairs to the demised premises or be obligated for the cost of any alterations or repairs required by any order by any Federal, State, or Municipal authority with respect thereto or the occupancy thereof, unless the same shall be made necessary by the act or negligence of the Lessee."

[3] "5. c) . . . *Lessor shall,* except as in this paragraph 5 and elsewhere in this lease otherwise specifically permitted or provided, *make all major repairs to all of the demised personal and real property belonging to Lessor,* and, without in any sense or degree limiting any term of this lease, expressly or by implication, repairs to or replacement of the roof on the demised premises shall constitute a major repair." (Emphasis added.)

were or were not "major repairs."[4] Kate refused to go to arbitration. McDougall claimed that the lease was ambiguous in certain areas and that the parties should go to court seeking a declaratory judgment as to their respective rights thereunder.[5] The representatives of the Pabis and Kimmel estates did not agree, but proceeded to nominate their arbitrator in accordance with the terms of the lease. McDougall then associated Nevada counsel and commenced this litigation in the district court.[6]

## II. THE NRCP 41(b) DISMISSAL OF THE CONSPIRACY COUNT

The essence of the conspiracy charge is that Winkel desired to relocate on Kietzke Lane in Reno, that property was purchased and a new building constructed thereon for that purpose, and that therefore Winkel conspired with the representatives of the Pabis and Kimmel estates to engage a city inspector "to condemn the property." We need not cite the record in this opinion; suffice it to say that a review of it indicates nothing therein to support such an allegation. The validity of the city order was never challenged. Winkel did not abandon the premises in October 1965, after the city report was issued, but continued paying rent through January 1966. Even "taking all of the evidence and inferences that reasonably could be drawn therefrom in favor of plaintiffs to establish a claim for which relief could be granted," we find nothing in the record which would support the conspiracy count; the district judge ruled correctly in granting the 41(b) motion to dismiss.

## III. CONTINUANCE OF THE TRIAL

The trial commenced on November 13, 1967, and continued for three days. Kate put on her case in chief, and she and McDougall testified at length. At the conclusion of the third day, the trial was recessed until January 8, 1968, so that the defendants could offer proof in support of their counterclaim. On January 8, Kate, through her Nevada counsel,

---

[4]"5. d) Anything in this paragraph 5 to the contrary notwithstanding, *if the parties hereto shall not be able to agree upon what, in a given case, shall constitute a major repair* of property belonging to Lessor, *the determination shall be resolved by arbitration, . . .*" (Emphasis added.)

[5]McDougall had drawn the master lease agreement for Kate.

[6]The Dodds' complaint originally sought only (1) an injunction restraining the lessees from proceeding with arbitration and (2) a declaratory judgment as to the rights of the parties; but it was later amended to include all the counts mentioned earlier in this opinion.

requested a continuance, claiming that she was ill and so was McDougall's mother. The district judge granted Kate's motion and continued the trial until January 22, 1968. On January 19, Nevada counsel for Kate requested an additional continuance on the ground that McDougall, California counsel, was ill and could not be present for the continuation of the trial on January 22. The district judge denied the motion, observing that McDougall had testified extensively for Kate during the November sessions.[7] On January 22, Nevada counsel appeared and again requested a continuance of the trial, offering a copy of a telegram from Kate advising that she and McDougall were ill.[8] The district judge refused to delay the trial any further, and the case went forward to conclusion.

Whether a continuance in a civil action should be granted because of the illness of counsel or of a relative of counsel is a matter that is largely committed to the discretion of the trial judge. Davis v. Shigley, 100 N.E.2d 261 (Ohio App. 1950); Thomas v. Toppins, 272 P. 1042 (Cal. 1928); In re Bollinger's Estate, 79 P. 427 (Cal. 1905); Volkering v. Allen, 216 P.2d 552 (Cal.App. 1950); Annot., 67 A.L.R.2d 497 (1959).

In ruling unfavorably upon the application, the trial court may give weight to the fact that the applicant has had prior continuances. Newton v. United States, 162 F.2d 795 (4th Cir. 1947), *cert. denied,* 333 U.S. 848 (1948); Benson v. Madden, 293 P.2d 733 (Ore. 1956); Annot., 67 A.L.R.2d 494 (1959). Sec also Giorgetti v. Peccole, 69 Nev. 76, 241 P.2d 199 (1952).

---

[7] Nevada Supreme Court Rule 185:

"Lawyer as witness. When a lawyer knows, prior to trial, that he will be a necessary witness, other than as to merely formal matters such as identification or custody of a document or the like, he should not conduct the trial. If, during the trial, he discovers that the ends of justice require his testimony, he should, from that point on, if feasible and not prejudicial to his client's case, leave further conduct of the trial to other counsel. If circumstances do not permit withdrawal from the conduct of the trial, a lawyer should not argue the credibility of his own testimony."

[8] "952P PST JAN 21 68 PRA 166 LA 498 L SJA351 PD TDSJ PALO ALTO CAIF 21 925P PST OLIVER CUSTER, DLR TONIGHT OR BEFORE 9 AM 220 CIRCLE DR RENO NEV AM STILL ILL DO NOT FEEL EQUAL TO TRIP TO RENO FOR TRIAL McDOUGALL ALSO ILL AND UNABLE TO TRAVEL
KATE
(29)."

Where the motion in which the application is made fails to meet the requirements of the practice in the particular jurisdiction, the refusal to grant the continuance is usually upheld. Joseph v. Norton Co., 273 F.2d 65 (2d Cir. 1959); Kurtzon v. Kurtzon, 90 N.E.2d 245 (Ill.App. 1950).

And where the party whose attorney is ill is represented by other counsel, denial of a continuance may be justified. Joseph v. Norton Co., supra; Jackson v. Jackson, 205 P.2d 297 (Okla. 1949); Whiteley v. Clegg, 48 S.E. 406 (Ga. 1904).

In this case, the district judge had granted one continuance. Both Kate and McDougall had testified in support of the Dodds' case during the November hearings and had rested their case. Kate's telegram could hardly be construed as meeting the requisites for a continuance as required by Nevada District Court Rule 21.[9]

---

[9] Nevada District Court Rule 21:

"Motions for continuance: Contents, service of affidavits; counter-affidavits; argument.

"1. All motions for the continuance of causes shall be made on affidavit.

"2. When a motion for the continuance of a cause is made on the ground of absence of witnesses, the affidavit shall state:

"(a) The names of the absent witnesses and their present residences, if known.

"(b) What diligence has been used to procure their attendance or their depositions, and the causes of a failure to procure the same.

"(c) What the affiant has been informed and believes will be the testimony of each of such absent witnesses, and whether or not the same facts can be proven by other witnesses than parties to the suit whose attendance or depositions might have been obtained.

"(d) At what time the applicant first learned that the attendance or depositions of such absent witnesses could not be obtained.

"(e) That the application is made in good faith and not for delay merely.

"3. No continuance will be granted unless the affidavit upon which it is applied for conforms to this rule, except where the continuance is applied for in a mining case upon the special ground provided by NRS 16.020.

"4. Copies of the affidavits upon which a motion for a continuance is made shall be served upon the opposing party as soon as practicable after the cause for the continuance shall be known to the moving party.

"5. Counter-affidavits may be used in opposition to the motion.

"6. No amendments or additions to affidavits for continuance will be allowed after they have been read, and no argument will be heard on motions for a continuance, except such as relate to the sufficiency of the affidavits read on the hearing."

Finally, the Dodds were well represented by their Nevada counsel, who had prepared and signed the pleadings and conducted the Dodds' case during the November hearings.

The district judge ruled correctly in denying Kate's motion for a continuance. Neven v. Neven, 38 Nev. 541, 148 P. 354, 154 P. 78 (1915); Benson v. Benson, 66 Nev. 94, 204 P.2d 316 (1949).

## IV. THE DUTY TO REPAIR

Kate complains that the district court erred in finding that correction of the structural deficiencies listed in the city inspector's report would constitute "major repairs" and that it was her duty as landlord of the master lease to make the repairs. The pertinent provisions of the master lease, in paragraphs 5(c) and 9, cited in footnotes 2 and 3, supra, are dispositive of this issue. It is clearly expressed therein that the "Lessor shall . . . make all major repairs to all of the demised personal and real property" and that "Lessee shall not be required to make any structural alterations or structural repairs to the demised premises or be obligated for the cost of any alterations or repairs required by any order by any Federal, State, or Municipal authority with respect thereto or the occupancy thereof, unless the same shall be made necessary by the act or negligence of the Lessee."

There is nothing in the record to indicate that the structural deficiencies cited by the city were in any way the result of any "act or negligence of the Lessee." Rather, the record shows that Winkel spent some $60,000 in remodeling and repairing the premises. Further, if an issue did in fact exist as to whether the correction of the deficiencies constituted major repairs, it could have been easily resolved by arbitration, as provided in the lease. The lessees were anxious to go to arbitration and had even nominated their arbitrator; then Kate commenced this action, preventing them from proceeding. She may not now be heard to complain, as the court's finding is amply supported by the record.

## V. EFFECT OF THE CITY'S ORDER

Kate attacked the validity of the city's order on several grounds, which we need not recite nor consider on this appeal,

because under the facts presented Kate may not challenge the order. As the district judge ruled in his decision:

"Plaintiffs [the Dodds] are not in a position now to question the order of the City since the City is not a party to this action. The report and order of the City was final."

In Goldring v. Kline, 71 Nev. 181, 189, 284 P.2d 374, 378 (1955), this court held:

"Lessees contend that, considering the repairability of the building, the city should not have ordered demolition. If the city's safety order was for any reason improper, it can hardly be challenged in an action to which the city is not a party."

See also Ripps v. City of Las Vegas, 72 Nev. 135, 297 P.2d 258 (1956); Maryland Cas. Co. v. Frank, 85 Nev. 209, 452 P.2d 919 (1969).

## VI. REQUEST FOR ADMISSIONS UNDER NRCP 36

Kate next complains that the district judge erred in deeming admitted the respondents' request for admissions. First, the answers were signed not by Kate but by her counsel. This alone would not be sufficient to sustain the district judge's ruling. Rule 36 of the Nevada Rules of Civil Procedure does not indicate that a sworn response to a request for admissions must be signed by the party himself, and it is considered sufficient if such sworn statement is made by his attorney upon information and belief. See United States v. Taylor, 100 F.Supp. 1016 (W.D.La. 1951); Van Horne v. Hines, 31 F.Supp. 346 (D.D.C. 1940); Benton v. McCarthy, 23 F.R.D. 235 (S.D.N.Y. 1959); Hartley & Parker, Inc. v. Florida Beverage Corp., 348 F.2d 161 (5th Cir. 1965).

The district judge found that the answers to respondents' request for admissions failed to comply with NRCP 36,[10] in that the answers were not truthful and were not set forth with the

[10]NRCP 36 reads in part as follows:

"(a) Request for Admission. . . . Each of the matters of which an admission is requested shall be deemed admitted unless, within a period designated in the request, not less than 10 days after service thereof or within such shorter or longer time as the court may allow on motion and notice, the party to whom the request is directed serves upon the party requesting the admission either (1) a sworn statement denying specifically the matters of which an admission is requested or setting forth in detail the reasons why he cannot truthfully admit or deny those matters or (2) written objections on the ground that some or all of the requested admissions are privileged or irrelevant or that the request is otherwise improper in whole or in part, together with a notice of hearing the objections at the earliest practicable time. . . ."

specificity required by the rule. We agree. A reading of the record of the trial demonstrates that Kate was in possession of sufficient facts to answer the request for admissions without qualification and with particularity. Instead, she answered with the elusive phrase: "Plaintiffs do not know and therefore deny the request. . . ."

2(A) Barron & Holtzoff, Fed. Practice & Procedure § 834 states at 513–515: "The admissions or denials must be forthright, specific, and unqualified. A denial coupled with a general exception of doubtful import, will constitute an admission. A refusal to admit without specific denial or detailed reasons why the responder cannot truthfully admit or deny, is the equivalent of an admission. . . . [I]f the truth can be ascertained by reasonable inquiry, the responder must admit or deny." (Footnotes omitted.)

As further pointed out in 4 Moore's Fed. Practice § 36.05 (2d ed. 1969) at 2748–2750:

"If the party wishes to deny the matters of which a request is admitted, he must do so 'specifically.' . . . The denial must be either an absolute denial or a denial on information and belief, with the sources thereof given.

". . . .

"If the party served with the request cannot *truthfully* admit or deny the matters stated therein, he may so state; but he must set forth in detail the reasons why he cannot do so. A mere statement that he is 'unable to admit or deny' or that he has no knowledge or no competent knowledge is not sufficient." (Footnotes omitted.)

Kate's answers failed to comply with the rule; the district judge ruled correctly in deeming the request for admissions admitted.

## VII. BREACH OF THE LEASE BY KATE'S REFUSAL TO ARBITRATE

The district judge found as follows:

### "XI.

"That the subject lease between plaintiffs and defendants COWGILL and PORTER contained arbitration covenants relating to the settling and adjusting of any disputes regarding plaintiff's duty to make major and structural repairs, which covenants defendants COWGILL and PORTER had a right to invoke.

"XII.

"That said defendants gave proper notice to plaintiff and performed all steps required under said lease to invoke said arbitration provision, but plaintiff wilfully refused and failed to adhere to the said arbitration covenants of the lease, which constituted a breach thereof on January 4, 1966."

And he concluded therefrom as follows:

"3. The failure on the part of the plaintiff to make the required repairs or submit the matter to arbitration constituted a breach of the covenants of the lease on the part of plaintiff Lessor."

There is substantial evidence in the record to support the district judge's ruling. The lease, which was drawn by McDougall, provided for arbitration. The respondents had nominated an arbitrator and were prepared to go forward with arbitration until Kate's attorney filed suit on the ground that the lease agreement, which that very attorney had drawn, was vague and required court interpretation before arbitration would be possible. If such in fact were the case, Kate could have sought relief under NRS 38.140, which provides:

"The arbitrators may, on their own motion, and shall by request of a party to the arbitration:

"1. At any stage of the proceedings submit any question of law arising in the course of the hearing for the opinion of the court, stating the facts upon which the question arises, and such opinion when given shall bind the arbitrators in the making of their award.

"2. State their final award in the form of a conclusion of fact for the opinion of the court on the questions of law arising on the hearing."

Instead, she breached the provision for arbitration, upon which respondents were entitled to rely. NRS 38.030.[11] See United Ass'n of Journeymen v. Stine, 76 Nev. 189, 351 P.2d 965 (1960).

There is substantial evidence to support the district judge's finding that Kate's refusal to arbitrate constituted a breach of the master lease.

---

[11]NRS 38.030:

"Two or more parties may agree in writing to submit to arbitration, in conformity with the provisions of this chapter, any controversy existing between them at the time of the agreement to submit. Such an agreement shall be valid and enforcible [sic], and no party shall have the power to revoke the submission without the consent of the other party or parties to the submission save upon such grounds as exist in law or equity for the rescission or revocation of any contract."

## VIII. SIMPLE VS. COMPOUND INTEREST

By the terms of the Ryland lease dated August 5, 1956, Kate received a security deposit of $15,000 that later, pursuant to agreement of the parties, was extended to cover the Tower lease. In accordance with the terms of the lease, Kate was required to place the deposit in an interest-bearing savings account, "as Trustee,"[12] and to pay at least annually to the lessees the interest earned on the sums held on deposit.[13]

The trial judge, in his amended judgment, ruled:

"2. That defendants PAUL COWGILL, as Administrator of the Estate of Joseph M. Pabis and H. H. PORTER, as Administrator of the Estate of Herbert E. Kimmel, have judgment against plaintiffs in the sum of $15,000.00, together with interest thereon at the rate of 7% per annum, compounded, from August 5, 1956 until paid, being the sum of $18,224.48, for the period ending August 2, 1968 and thereafter accruing at the rate of $5.95 per day until August 5, 1968 wherein the rate will compound for an additional year, being the rate of $6.38 per day until August 5, 1969, wherein the rate will compound for an additional year."

Kate never paid the annual interest which was a liquidated

---

[12]"c). Lessor shall deposit all sums paid by Lessee by way of security deposits under this lease in a savings account or accounts in a bank, banks, building and loan association or associations and/or savings and loan association or associations in California or in Nevada, in such manner and under such terms that the interest of Lessor and Lessee is clearly set forth with respect thereto; and Lessor and Lessee agree to execute any and all agreements or papers required by the depositary in each case in order to effectuate the terms hereof with respect to such deposit. Such deposit or deposits shall be in the name of Lessor, as Trustee, and the signature of no Lessee or successor in interest of the Lessee shall be required to enable said Trustee to withdraw funds from any such deposit nor shall the depositary be empowered to determine whether a proposed withdrawal by Lessor shall comply with the terms hereof."

[13]"f). The amount of interest received by Lessor as said Trustee or credited to Lessor as said Trustee by reason of any deposit into a savings account as hereinabove provided, of any security payments made by Lessee shall, *at least once each calendar year,* be paid by Lessor to Lessee by check or draft. Anything in this agreement to the contrary notwithstanding, interest so paid to Lessee shall no longer be considered part of said security payments as between Lessor and Lessee and any provision herein to the effect that Lessor shall repay to Lessee any security payments or deposits shall not include any interest paid to Lessee pursuant to the provisions of this sub-paragraph f)." (Emphasis added.)

sum due and payable "at least once each calendar year." Therefore, the trial judge awarded respondents interest on the annual interest installments from the time they became due—or compound interest, as he characterized the award—which was proper in this case. Cf. NRS 99.040; Paradise Homes, Inc. v. Central Sur. & Ins. Corp., 84 Nev. 109, 437 P.2d 78 (1968).

Affirmed.

COLLINS, C. J., ZENOFF, BATJER, and THOMPSON, JJ., concur.