**SOUTHWESTERN PUBLISHING CO.,** Inc., a corporation, A. E. Cahlan, Nevada Citizens Committee, Incorporated, Southern Nevada Chapter, a corporation, Appellants,

v.

Charles Lee HORSEY, Appellee.

No. 14738.

United States Court of Appeals Ninth Circuit.

Feb. 17, 1956.

Jones, Wiener & Jones, Milton W. Keefer, Las Vegas, Nev., W. Howard Gray, Ely, Nev., Bruce R. Thompson, Reno, Nevada, for appellants.

Rudiak, Horsey & Lionel, Las Vegas, Nev., Clyde D. Souter, Reno, Nev., for appellee.

Before DENMAN, LEMMON and CHAMBERS, Circuit Judges.

CHAMBERS, Circuit Judge.

Charles Lee Horsey was appointed to fill a vacancy on the Nevada Supreme Court in October, 1945. He ran for election in 1946 to fill the remainder of his predecessor's term and was elected, defeating one W. T. Mathews. In the fall of 1950, Judge Horsey ran again. This time he was defeated by a different opponent, Charles M. Merrill.

On Sunday, November 5, 1950, two days before the general election, a large newspaper display advertisement was published in the Las Vegas Review-Journal reading as follows:

"a Timely message to All Nevada Voters who believe in government Of All the people, By All the people, For All the people * * *
 Vote Only For An
 Impartial Candidate For
 Supreme Court Justice!!

"No man whose statements show a Bias in favor of any special interest or group has any business on the bench!

"The Nevada Citizens Committee Urges You to

Vote Against

charles lee horsey

Candidate for Supreme Court Justice

"The editorial reprinted herewith states the case against horsey. It is reprinted in full from a Northern Nevada newspaper, the Lovelock 'Review-Miner.'

"Your Editor Plans To Vote Against Justice Horsey on November 7th

"An Editorial, by Paul K. Gardner

"Your editor is going to vote against Supreme Court Justice Chas. Lee Horsey on November 5.

"The reason is that he has a biased viewpoint on certain cases coming before him.

"When the justice called at The Review-Miner office recently while conducting his campaign, the following conversation took place:

"Editor: 'What about the report that you are pro-labor?' Justice Horsey: 'I admit I am.' Then he chuckled.

"No justice has any business on the bench who has a bias. He is sworn to approach each case with an open mind. Each case must be considered on its merits. A judge with opinions, not subject to change, cannot do that.

"By pro-labor is meant labor racketeers. The laboring man, in and out of the union, seeks only a fair deal. The labor racketeers seek to gain ends whether fair or not.

"Such a case recently came before Justice Horsey. It had to with a law adopted in 1913. He joined with Justice Eather in declaring it unconstitutional. It took away right of a business to prosperity without having recourse to the courts of justice by giving the right to labor racketeers to harass it.

"Involved was the White Cross Drug Store of Las Vegas. There was no labor difficulty. The employees were well paid, satisfied and

nonunion. The labor racketeers demanded that the store be unionized against the will of the workers and the owner. When refused, pickets were ordered in front of the store. An injunction was obtained, as we understand the matter. Justice Horsey ruled that the law under which the injunction was issued was no good. In effect, he gave the racketeers permission to put on pickets indefinitely to drive union patronage away. Such ruling enables the racketeers to force every business in the country into union contracts whether the owners or their employers were in favor of it or not. In other words, it deprives an owner from conducting a profitable business and working people of the right to work.

"It makes no difference to us: Any man who is prejudiced in favor of business, labor, labor racketeers, farming or gambling, has no business on the Nevada supreme court bench.

"This editorial appeared in the Lovelock Review-Miner, October 26, 1950.

"Urge your friends Not to vote for horsey for Supreme Court Justice! Please re-read the last sentence of the above editorial: 'Any man who is prejudiced in favor of business, labor, labor racketeers, farming or gambling' (or, we add, any other specialized interest) 'has no business on the Nevada Supreme Court bench.'

( )

"A Reminder: Work for the Right to work * * * Sign the Initiative Petition!

"'Nevada
Citizens
Committee

"'True Representative of and by the People

(Insignia of a Hand holding a Torch)

Nevada Citizens Committee

"'Box 741 Las Vegas, Nevada.

"'Nevada voters fortunately are blessed in that they have excellent choice among the many good opposing candidates running for public office. The Nevada Citizens Committee is unalterably opposed to any candidate whose record or back ground indicates bias against the general public interest.' "

"Paid Political Adv."

The particular Sunday edition of the newspaper had a circulation of 14,000. The record does not show the apportionment of circulation among the City of Las Vegas, Clark County (in which Las Vegas is located), other counties in Nevada, and places without Nevada.

Since his defeat, Judge Horsey has moved to California where he is now a citizen. Defendants perhaps would not deny that Judge Horsey has become a rather tragic figure, suffering from great mental depression since his defeat.

On July 22, 1952, Judge Horsey filed a libel action against Southwestern Publishing Company, Inc. (publisher of the Review-Journal), A. E. Cahlan (its managing director), Nevada Citizens Committee, Incorporated (Southern Nevada Chapter, a Nevada Corporation), A. W. Blackman, Vern Willis, Frank M. Bollig, Abe Miller and Harry E. Claiborne, individually and as Trustees of the Southern Nevada Chapter of Nevada Citizens Committee, Incorporated, and J. R. Henderson.[1] The action was based upon the above quoted publication. The damage pleaded was the judge's loss of professional reputation and personal esteem among his fellow men, his loss of the office and its perquisites, and his own inability to adjust himself mentally, all of which he attributed to the publication.

The issues of the case were submitted to a jury and a verdict of $10,000 for compensatory damages and $15,000 for

---

1. The case was not submitted to the jury as to defendants Blackman, Willis, Bollig, Miller, Claiborne and Henderson.

punitive damages was returned against all defendants remaining in the case. (They are the appellants here). Judgment was entered accordingly.

The question of libel or no libel was treated by the plaintiff and the court as a question of fact. Also, the defendants put in a vigorous defense of fair comment.

On appeal, the defendants contend that the verdict abridges free speech guaranteed by the First Amendment. Further, the contention is made that the publication on its face is not libelous as a matter of law.

■■ This court is confident that the cause should not be reversed on either of the above contentions. The law of libel will not be labored here. It is enough to say that the easy way in which the quoted editorial of the Lovelock Review-Miner slips without transition from Justice Horsey's "I admit I am (pro-labor)" to "By pro-labor is meant labor racketeers," set the stage at the very least for a question of fact trial before a jury on the issues of libel and fair comment.[2]

Further, it would seem that the judgment is not so great as to be monstrous and subject to review here. There appears to have been evidence upon which the jury could have found some compensatory damages and evidence from which it could have found malice.

But appellants make one specification of error which this court sustains as well taken

The trial court admitted in evidence the election returns of Clark County, Nevada, in which Las Vegas is situated, for the 1946 election and the 1950 election.

The returns showed the following results for Clark County:

| 1946 | | |
|---|---|---|
| | Horsey | 7,297 votes |
| | Mathews | 2,446 votes |
| 1950 | | |
| | Horsey | 8,136 votes |
| | Merrill | 7,020 votes |

■■ The court correctly instructed the jury that the loss of an election is not compensable in damages in a libel action, being too uncertain and too speculative. See Otero v. Ewing, 165 La. 398, 115 So. 633. But the evidence of variance in the comparative vote at the two elections was admitted as evidence of loss of esteem, one must assume.[3] It can be argued that the returns have some relevance on "loss of esteem." But this court believes that every reason for not allowing loss of an election as damages applies to the admission of the election returns to show loss of esteem. It is just too speculative and conjectural. There may be not less than a thousand factors which enter into the vagaries of

2. The court, following Nevada State Journal Publishing Co. v. Henderson, 9 Cir., 294 F. 60, 63, instructed the jury on libel as follows:

"'But the distinction must be drawn between comment and criticism, and untrue charges of facts constituting a crime or disgraceful conduct. It is one thing to pass severe criticism upon, or to draw even extreme inferences from, acknowledged facts, or to indulge in intemperate denunciation, even though bitter, and quite another thing to assert the existence of particular acts of criminality or of shameful misconduct upon the candidate's part.'"

Of the instruction, appellants make no complaint. They just say the instruction was inapplicable.

3. Counsel for plaintiff, in offering the election returns, said, " * * * [I]t is offered for—purely and simply as—possible effect of the advertisement in question upon the People of Clark County." The court said, "When it was first offered I was inclined and did rule against the admission of that evidence on the theory that the loss of an election had no bearing upon any of the merits of this case, but now, in view of the statement of counsel, as to its limited purpose, as a circumstance intending to show the effect of the publication in Clark County, it will be admitted in evidence." It would seem that it is fair for this court to characterize the theory as "proof of loss of esteem." The trial court had excluded the returns for the purpose of showing "loss of votes" per se or "loss of an election."

an election and the comparison of prior returns.

A few are suggested here:

1. How much other newspaper advertising entered into the campaign in Clark County and other Nevada counties?

2. What editorials or news stories with respect to the candidate appeared in Nevada papers?

3. What was said about the candidates over the radio and television in Nevada?

4. What percentage of the Las Vegas Review-Journal circulation goes to Clark County?

5. How well is the paper read and is it respected?

6. What were the political party leanings of the people who moved into and those who moved out of Clark County during the period 1946–1950?[4]

7. Was political party support a factor in the election and how much support did each have?

8. What groups supported one candidate or the other and what workers did each candidate have in 1946 and in 1950?

9. What personal campaigning did each candidate do each year and how effective was it?[5]

10. What events had Judge Horsey participated in that may have affected his intervening popularity? Were his two opponents naturally popular men?

11. Were the elections affected in any way by political party trends? How did other members of the judges' respective parties fare in the election, if they were members of different parties?

12. Were the comparative ages each time of the candidates a factor?

13. Were there any issues? If so, what? How did the candidates handle them?

The queries above show that if the Clark County returns were admissible, then they opened up a Pandora's box. Such evidence could not be received without permitting other evidence of all the thousand other factors that entered into the election. If the election returns, established prima facie a loss of esteem, then the defendants were entitled to explore fully the whole election and perhaps, in the end, expert opinions, an obvious absurdity, might be necessary to say just why Judge Horsey lost ground in four years in Clark County.

If one is entitled to examine Clark County then the door is opened for exploration of the vote in every other county of the state of Nevada.

The net result of such an exploration into the uncertainties of an election can only lead to confusion. It is submitted that this character of evidence has been historically rejected and wisely so. See Sharples Separator Co. v. Skinner, 9 Cir., 251 F. 25. Golden Reward Mining Co. v. Buxton Mining Co., 8 Cir., 97 F. 413; 31 C.J.S., Evidence, § 159, p. 867; East Bay Municipal Utility District v. Kieffer, 99 Cal.App. 240, 278 P. 476 at page 480, 279 P. 178.

4. It is recognized that Nevada statutes provide for a "non-partisan" judicial selection at the same time and on the same ballot as the partisan elections. But can anyone say, without knowing, that party membership or party support is not a factor in such elections?

5. The testimony indicates that when Judge Horsey was appointed to the Nevada Supreme Court in 1945 he was a resident of Las Vegas, Nevada. The records of this court seem to indicate that his 1946 opponent, Mathews, has been a resident of Carson City, Nevada, at least since 1941.

Although this court will not attempt to explain Nevada election returns, which the jury was permitted to do solely on the basis of comparative returns, it may not be amiss to suggest that the residence of the opponents may have been a great factor in Clark County in the two elections. Also, it is possible that long absences from Las Vegas of Judge Horsey in Carson City attending to his judicial duties may have hurt him at a time when the 1950 opponent Merrill was busy making friends in Clark County. It is not here asserted that such factors are valid, but they illustrate the unreliability of correlating the accused publication to the election returns.

Having concluded that the evidence was inadmissible, was it prejudicial? That, of course, depends on judgment. This court thinks its was prejudicial. The following factors enter into the conclusion of prejudice:

1. The trial was relatively short (about one day was devoted to the reception of evidence)' and the evidence of the Clark County returns was not inconspicuous.[6]

2. The jury received them as evidence of loss of esteem. At first blush, it does look reasonable that the publication may have caused loss of esteem. Without the other factual elements (equally inadmissible) the returns tend to get out of focus. It is hardly enough to say that the defendants could have argued to the jury that (in the Clark County returns) there were other factors. Counsel could not have related the actual facts of the other elements.

3. On a consideration of the whole short record, it is all too likely that this improper evidence of loss of esteem played a high role in the assessment of damages.

It is apposite to paraphrase the words of Mr. Justice Cardozo in Shepard v. United States, 290 U.S. 96, at page 104, 54 S.Ct. 22, at page 25, 78 L.Ed. 196, at page 202 where he said:

"The reverberating clang of those accusatory words [here not 'accusatory words' but 'Clark County election returns'] would drown all weaker sounds. It is for ordinary minds * * * that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out."

Defendants should have a new trial.

Judgment reversed.

---

6. It appears in the record that the issues were tried twice and that the result of the second trial is here on appeal. At oral argument, counsel related that the first trial resulted in a verdict for the plaintiff for one dollar actual damages and one dollar for punitive damages. Thereafter, a new trial was granted.

The election returns were certified by the secretary of state on February 2, 1954, and received in evidence at the second trial on February 3, 1954. Thus, it may be assumed they were not presented to the first jury.