NEVADA INDEPENDENT BROADCASTING CORPO-RATION, A CORPORATION, AND WILLIAM H. HERN-STADT, APPELLANTS, *v.* WILLIAM C. ALLEN, RESPONDENT.

No. 13469

May 27, 1983 664 P.2d 337

---

*Hilbrecht, Jones, Schreck & Bernhard* and *L. T. Jones, George A. Cromer,* Las Vegas; *Henry Mark Holzer,* Brooklyn, New York, for Appellants.

*Galane & Jimmerson, Rickdall & Shulman,* Las Vegas, for Respondent.

## OPINION

By the Court, SPRINGER, J.:

This appeal arises out of a jury verdict and judgment of $675,000 in general damages awarded to respondent Allen and against appellants (to be called "Hernstadt") for defamation of character.

### Statement of the Facts

This slander suit arose out of a televised political question-answer program during the 1978 Nevada primary campaign. Allen was running against Robert List in the Republican gubernatorial primary. Allen had contracted with Golden West Advertising Agency, a Las Vegas firm, to handle his campaign. On September 11, 1978, the eve of the primary election, Allen appeared on a program for candidates on the Las Vegas station KVVU-TV (Channel 5). The station is owned by appellant Nevada Independent Broadcasting Corporation (NIBC). Moderator for the candidate's program was appellant William Hernstadt, who held 94 percent of the stock in NIBC.

During the afternoon prior to the television broadcast, Hernstadt discovered that a check from Allen's advertising agency, Golden West, had been returned to the station because of insufficient funds. The check, in the amount of $697.00, had been issued to pay for Allen's political advertising. That evening, during a live broadcast, Hernstadt questioned Allen concerning the check and made some additional remarks about the check. Hernstadt's statements were as follows: He initially accused Allen of passing a check with insufficient funds; then he mentioned Golden West, Allen's advertising agency. Later in the program Hernstadt questioned what a political candidate who didn't pay his bills would do if allowed to handle state funds. Finally, he referred to another candidate as "honorable" in a context which would permit the implication that Allen was not honorable. These comments are set out in full in the margin[1]: The court has viewed the video tape of the described episode.

During a commercial break, Allen's son, his campaign manager, demanded an apology. Hernstadt acknowledged the

---

[1] *See* Appendix to Opinion of the Court.

demand to the television audience but did not then make an apology. Later Allen demanded in writing that NIBC publish a correction. After the station and Allen were unable to agree on an appropriate correction, the station issued its own version of a correction.

This suit followed. The case was tried to a jury which returned a verdict for Allen, awarding general damages of $675,000 plus interest and costs. Appellants filed a motion for a new trial, a motion for judgment notwithstanding the verdict, and a motion to amend the judgment. Appellants appeal from denial of these motions.

### Failure to Prove Slander Per Se

Hernstadt correctly argues that since there was no proof of special damages, Allen's case must be slander *per se* or he has no case. We are of the opinion that Allen has made out a case of slander *per se*.

To constitute slander *per se,* the alleged defamation must be oral and must fall into one of four categories: (1) that the plaintiff committed a crime; (2) that the plaintiff has contracted a loathsome disease; (3) that a woman is unchaste; or, (4) the allegation must be one which would tend to injure the plaintiff in his or her trade, business, profession or office. Branda v. Sanford, 97 Nev. 643, 637 P.2d 1223 (1981).

Hernstadt urges that Allen had no basis for claiming slander *per se* on the basis of injury to his professional reputation. Two reasons are stated for this claim. First, at the time of the campaign, Allen's only occupation was that of owner of a mobile home park in Carson City; therefore, since he was a non-incumbent, he had no political career which could have been injured. Second, Hernstadt argues that the "bounced check" charge could not injure Allen's reputation as a mobile home park owner.

We disagree. At the time the remarks were made Allen was a candidate, and the statements were such that they could have injured Allen's reputation as a candidate for public office. They were thus actionable as slander *per se.* In the case of Devany v. Quill, 64 N.Y.S.2d 733 (N.Y.App.Div. 1946), it was held that defamatory words uttered aganst a non-incumbent candidate constituted slander *per se* if the words would tend to cause persons not to vote for the candidate. This rule has been followed in Restatement (Second) of Torts § 573 comment b (1977). Hernstadt cites no authority to the contrary.

Hernstadt urges that Allen could not make a case for slander

*per se* unless Allen first proved that the defamatory comments implied "an habitual course of similar conduct, or the want of the qualities or skill that the public is reasonably entitled to expect. . . ." *See* Restatement (Second) Torts § 573 comment d (1977). Hernstadt argues that since he alleged only a single act of misconduct, namely, delivery of a bad check, the defamation could not constitute slander *per se*.

There were, of course, three remarks—that Allen's check was no good, that because Allen did not pay his debts it was questionable how Allen might handle state funds, and that Allen was not an honorable candidate. Assuming at this point that these comments were defamatory, taken as a whole they clearly imply a want of qualities expected of a public officer and support a case for slander *per se*.

### Fact or Opinion

We agree with appellants that statements of opinion as opposed to statements of fact are not actionable. As stated in Gertz v. Robert Welch, Inc., 418 U.S. 323, 339 (1974), under the first amendment, there is no such thing as a false idea, and the societal value of robust debate militates against a restriction of the expression of ideas and opinions.

Separating factual statements from opinion is thus a critical issue in defamation cases. The rule for making the determination is more easily stated than applied: whether a reasonable person would be likely to understand the remark as an expression of the source's opinion or as a statement of existing fact. *See* Masburn v. Collin, 355 So.2d 879, 885 (La. 1977). In cases involving political comment, there is a strong inclination to determine the remarks to be opinion rather than fact. R. Sack, *Libel, Slander, and Related Problems* 160 (1980). Although ordinarily the fact/opinion issue is a question of law for the court, where the statement is ambiguous, the issue must be left to the jury's determination. Good Gov't Group, Inc., v. Hogard, 586 P.2d 572, 576 (Cal. 1978), *cert. denied,* 441 U.S. 961 (1979).[2]

---

[2]Appellants assert that New York Times Co. v. Sullivan, 376 U.S. 254 (1964) requires that plaintiff prove by "clear and convincing evidence" that the remarks were factual and not opinion. *New York Times* does not stand for that proposition; though the decision does require a higher standard of proof for actual malice and colloquium, at least with respect to public officials.

A major difficulty in defamation cases arises when the comment is neither pure fact nor pure opinion. A statement may be a "mixed type," that is, an opinion which gives rise to the inference that the source has based the opinion on underlying, undisclosed defamatory facts. For example, it may be actionable to state an opinion that plaintiff is a thief, if the statement is made in such a way as to imply the existence of information which would prove plaintiff to be a thief. *See* Restatement (Second) of Torts § 566 (1977).

In the immediate case, the trial court left the decision to the jury to determine whether any of the three mentioned categories of remarks were opinion or fact. This was proper. We will consider these categories in order:

### The "Bounced Check" Remark.

Hernstadt addressed the following remark to Allen: "[O]ne of your checks for political advertising for $697.00 was returned to, to this television station, 'Refer to Maker' and we called the bank and we found that check wouldn't clear today."

It is contended that the "bounced check" statement was merely a statement of Hernstadt's opinion that Allen had bounced a check. The argument is meritless; if such a contention were accepted, any statement of fact could be considered simply the opinion of its maker.

### The "State Funds" Remark.

Hernstadt next argues that, as a matter of law, the following question could not be found to be a statement of fact: "[I]f the candidate doesn't pay his political bills, what is he going to do with State money?" It is conceded that defamation may occur in the form of a question, but the remark is challenged on two other grounds. First, it is contended that it is at worst a statement of opinion; second, it is argued that the remark cannot be defamatory because it is speculative, dealing with future events rather than existing facts.

Using the analysis of the Restatement, which both parties adopt, the remark is susceptible of being interpreted as a statement of defamatory fact. The first clause of the remark implies that Allen did not pay his political bills. This is the meaning that Hernstadt concedes he intended to convey. Regardless of whether the second clause is opinion or speculation, the first clause is a factual statement and would be actionable under the Restatement.

## The "Honorable Candidate" Remark.

Following Hernstadt's comment that Allen's representatives had requested an apology, and immediately following the "State funds" remark, Hernstadt stated, "But getting back to an honorable candidate, Senator Schofield. . . ."

Hernstadt claims that the "honorable candidate" remark cannot be actionable. The primary basis for this claim is that the remark was at most a statement of opinion.[3] The remark might reasonably be interpreted as a statement of opinion; it appears to be the speaker's conclusion, based on his allegation that Allen bounced a check. It cannot be said as a matter of law that the statement cannot also be interpreted as factual. This remark seems to be precisely the kind of ambiguous comment that should be left to the determination of the jury. *See Good Gov't Group,* above; Gregory v. McDonnell Douglas Corp., 552 P.2d 425 (Cal. 1976).

Even if we were to assume that some of the foregoing remarks were not actionable, it nonetheless is reasonable to consider all the comments in context. In any case, the most damaging remarks were the two clearly factual statements.[4] Also, it may be concluded that fact and opinion were "inextricably intertwined" and thus the comments were unprotected. *See* Cianci v. New Times Publishing Co., 639 F.2d 54, 67 (2d Cir. 1980).

### *Falsity*

Hernstadt charges that Allen did not sufficiently establish the falsity of Hernstadt's remarks. He claims that Allen must prove falsity by "convincing clarity," citing Garrison v. Louisiana, 379 U.S. 64, 74 (1964).

The Supreme Court said in *Garrison* that there can be no liability for defamation without proof of falsity; the Supreme Court, however, has not fully developed the consequences of its holding. It seems clear that the plaintiff must now bear the burden of proof regarding the falsity of statements. *See*

---

[3]Hernstadt also claims that Allen failed to establish by clear and convincing evidence that each of the alleged remarks was "of and concerning" Allen. *See* New York Times Co. v. Sullivan, 376 U.S. 254 (1964). The context of the remarks would lead one to conclude that all three comments were concerning Allen; secondly, Hernstadt himself admitted that he was referring in each instance to Allen.

[4]Indeed, the questioning of Allen's handling of State funds is really the defamatory sting: it arose from the factual statement that Allen did not pay his bills.

Restatement (Second) of Torts § 613 (1977). The degree of proof is yet unclear.[5]

Hernstadt argues that the "bounced check" statement was true because Allen was responsible for Golden West's check. He also asserts that the statement relating to a candidate who "does not pay his bills" was similarly true since Allen was liable for his agent's bad check. Finally, Hernstadt claims that Allen was in fact dishonorable for having eschewed responsibility for Golden West's bounced check.

Whether a statement is false is generally a question for the jury. Restatement (Second) of Torts § 617 (1977). The jury would certainly have been justified in finding that Allen, who was not a signatory to the check, was not responsible for the "bounced" Golden West check. Likewise, the jury could have found that Allen "bounced" no check, and that he was neither dishonorable nor a candidate who did not pay his bills.

### Privilege

We decline to consider Hernstadt's argument concerning privilege since it appears that the common law privileges have been subsumed in recent constitutional law developments.[6]

---

[5] *Garrison* does not discuss the standard of proof. The higher standard of "convincing clarity" ostensibly applies only to the issues of colloquium (identification of the plaintiff) and "actual malice." *See generally,* Rebozo v. Washington Post Co., 637 F.2d 375 (5th Cir. 1981), *cert. denied,* 454 U.S. 964 (1981). Some courts, however, have applied the convincing clarity standard to the issue of falsity. *See, e.g.,* Whitmore v. Kansas City Star Co., 499 S.W.2d 45 (Mo.App. 1973). Practically speaking, it may be impossible to apply a higher standard to "actual malice" than to the issue of falsity.

[6] The fair comment doctrine arose to protect statements of opinion on newsworthy material. Since *Gertz* now gives first amendment protection to opinion remarks, the fair comment doctrine is no longer necessary. And with respect to the conditional privilege protecting statements made in the public interest, a similar result obtains. The conditional privilege protected statements made in the public interest so long as the privilege was not abused. One method of abusing the privilege was the uttering of statements either with reckless disregard for their truth or with knowledge of their falsity. *See* Wright v. Haas, 586 P.2d 1093 (Okla. 1978). The constitutional protection, set forth in *New York Times Co. v. Sullivan* (discussed immediately below), gives at least as much protection as the common law privilege. Thus, in the context of a media defendant and public figure, there is no longer any need for the common law privilege. This view is taken in the Restatement (Second) of Torts § 592A (1977); *see also New York Times,* above, at 376 U.S. 292 n. 30; R. Sack, above, at 331-34.

*New York Times Co. v. Sullivan*

Under the rule established in *New York Times Co. v. Sullivan,* above, a media defendant may not be held liable for damages in a defamation action involving a public official plaintiff unless "actual malice" is pleaded and proved. This rule was extended to public figure plaintiffs (such as respondent Allen) in Curtis Publishing Co. v. Butts, 388 U.S. 130 (1967).

Actual malice (or more appropriately, *constitutional* malice) is defined as knowledge of the falsity of the statement or a reckless disregard for the truth. *New York Times,* above, at 280.[7] Reckless disregard for the truth was defined in Garrison v. Louisiana, above, a criminal libel suit, as a "high degree of awareness of [the] probable falsity [of the statement]." *Id.* at 74. In St. Amant v. Thompson, 390 U.S. 727 (1968), the stated test was whether there is sufficient evidence to conclude that "the defendant in fact entertained *serious doubts* as to the truth of [the] publication." *Id.* at 731. (Emphasis supplied.) In contrast to common law malice, the inquiry in "actual malice" focuses largely on the defendant's belief regarding truthfulness of the published material rather than on the defendant's attitude toward the plaintiff. *See* Greenblet Coop. Pub. Ass'n, Inc. v. Bresler, 398 U.S. 6, 10 (1970).

The standard for appellate review is comparable to the method applied in determining the voluntariness of a confession in criminal law. Because a constitutional guaranty is involved, the trial court must first determine whether there is sufficient evidence from which the jury could conclude that the statements were uttered with "actual malice." *See* Alioto v. Cowles Communications, Inc., 623 F.2d 616 (9th Cir. 1980), *cert. denied,* 449 U.S. 1102 (1981). A jury's finding of actual malice must be based on "clear and convincing evidence." *New York Times,* above.[8] Because a constitutional right is implicated, the jury determination is subject to close appellate scrutiny.

---

[7] *Cf.* NRS 41.332:

NRS 41.332 "Actual malice" defined. "Actual malice" is that state of mind arising from hatred or ill will toward the plaintiff and does not include that state of mind occasioned by a good faith belief in the truth of the publication or broadcast.

[8] The parties disagree on whether the trial judge must first weigh all evidence (including witness credibility) and conclude that "actual malice"

The fundamental inquiry, as one court has stated it, is *"Did the defendant lie?" See* Pierce v. Capital Cities Communications, Inc., 576 F.2d 495, 506 (3rd Cir. 1978), *cert. denied,* 439 U.S. 861 (1978). The test is subjective, with the focus on what the defendant *believed* and *intended to convey,* not what a reasonable person would have understood the message to be. R. Sack, above, at 212-13.

Evidence of negligence, motive, and intent may be used, cumulatively, to establish the necessary recklessness. *Id.* at 214. It is clear that in most instances one factor alone will not establish actual malice by convincing clarity. *Id.* at 217.

Support for the jury's finding of actual malice can be supplied by the following evidence:

(1) Hernstadt's admittedly deliberate decision not to ask Allen about the check until Allen was on live television, *see Alioto,* above, at 1371 (failure to pursue the most obvious source for corroboration), Rebozo v. Washington Post Co., above, (reporter's decision to resolve ambiguity in information against plaintiff although reporter had contacted witness who could clarify ambiguity);

(2) Hernstadt knew that Allen had not drawn or passed the check in question;

(3) The commonplace word "your," as in "your check," need not be taken to mean "your campaign's [check]," regardless of Hernstadt's testimony as to his meaning, and could well be taken to mean Allen's own check;

(4) Hernstadt's attempt at correction could be taken as a *republication* since it insinuates the following: (a) that Allen committed a wrongful act short of a felony; (b) that Allen had a dishonorable motive as indicated by his failure to explain why the original agency check was returned; and, (c) that payment "after the fact" of the broadcast was additional proof that Allen was dishonorable; *see* Restatement (Second) of Torts § 580A comment d (1977) (republication by defendant after notification that plaintiff considers the statement to be false and defamatory may be treated as evidence of reckless disregard);

(5) Several material *contradictions* exist with regard to

---

has been established by clear and convincing evidence (*see, e.g.,* Wasserman v. Time, Inc., 424 F.2d 920 (D.C.Cir. 1970), *cert. denied,* 398 U.S. 940 (1977)), or whether the judge must simply proceed as with any other motion for summary judgment, drawing all inferences in favor of the nonmoving party (plaintiff); *see, e.g., Alioto,* above. Appellants concede that, as a practical matter, this dispute makes no difference.

Hernstadt's trial testimony and his previous deposition testimony; these include his admissions at deposition that (a) he told others of his intention to mention the check during the live broadcast and, (b) he intended to convey to the audience that Allen was not honorable, *see, e.g.,* Holter v. WLCY T.V., Inc., 366 So.2d 445, 453 (Fla.App. 1978); Davis v. Schuchat, 510 F.2d 731, 736 (D.C.Cir. 1975) (jury may consider credibility of witnesses in determining issue of actual malice).

Hernstadt's position on the issue of actual malice is essentially that he held a good faith belief in the truth of his comments. Hernstadt testified that he believed the check in issue to be Allen's because it was Allen's campaign check; he further testified that he believed FCC regulations required advance payment for political advertising, and that Allen, therefore, was legally and morally responsible for the bad check. Hernstadt claimed that he bore no ill will toward Allen and that the actual substance of his remarks resulted because the bounced check was "hot news," which did not allow him time to investigate.

 ██

Hernstadt knew the check was Golden West's; furthermore, he made no demand of Allen, prior to the show, for payment to cover the check. In light of those facts, it seems disingenuous for Hernstadt to claim that he believed Allen to be a dishonorable candidate who did not pay his bills. There is enough in the record to support a jury finding of constitutional malice.

### Retraction

 ██

The sufficiency of the correction and the demand for retraction are questions of fact for the jury to determine by a preponderance of the evidence. Boswell v. Superior Court, 609 P.2d 577 (Ariz. 1980); *see also* Brogan v. Passaic Daily News, 123 A.2d 473 (N.J. 1956). At common law, a retraction was required to be full and unequivocal to be legally sufficient. *Brogan,* above, *see also* R. Sack, above, at 377. In the immediate case, the jury could properly conclude that the correction was insufficient.

### Instructions

We have carefully examined the instructions claimed by appellants to be erroneous and find no prejudicial error.

### Motion for a New Trial

We find no abuse of discretion in the court's denial of the motion for new trial.

## Error in Award of Damages

Hernstadt raises several separate attacks on the award of damages. The jury awarded $675,000 in general damages; it awarded no special or exemplary damages, though it was instructed in all three areas. The first question raised is whether the award was improper because Allen failed to prove actual damages.

In defamation actions, general damages are those which are awarded for "loss of reputation, shame, mortification and hurt feelings." NRS 41.334.

The parties agree that Allen's testimony was competent to establish his shame, mortification and hurt feelings. Allen testified that the broadcast in issue was "one of the most humiliating experiences" of his life. He described his reaction during the questioning as one of "shock," stating that he was "stunned," and "in a chaotic state of mind." He felt that people viewed him as an "embezzler" or a "bad check artist."

A substantial amount of testimony was offered by Republican party leaders to establish damage to Allen's reputation. Virtually everyone conceded that Allen had little hope of winning the Republican gubernatorial nomination, but Allen had a growing and favorable political reputation within the party. There was testimony that the public would not quickly forget the bad publicity, that the story would likely resurface if Allen chose to run again for office, and that Allen had been "politically assassinated." It is fair to conclude that Allen's reputation was damaged, and though Allen might previously have been in line for an appointive office, his potential was greatly diminished by the incident.[9]

There was testimony that approximately 7,800 households (with an average of 2.7 members per household) were tuned into the station for at least 5 minutes during the average quarter-hour of reported time. One viewer who had watched the show testified that she did not immediately recall whether the bounced check had been attributed to Allen's advertising agency. She stated that she believed Hernstadt had handled the matter poorly, that Allen had been presented poorly, and that as a result, she no longer considered Allen to be a viable candidate.

A political consultant testified as an expert witness that in his opinion Allen's political reputation had suffered as a result of the broadcast, and that Allen's chance for an appointive office had been considerably lessened.

---

[9]There was also some contrary testimony to the effect that the witnesses themselves did not personally think less of Allen nor could they name anyone who did.

Allen is entitled to recover general damages. He is entitled to compensation for his shame, humiliation and hurt feelings. Also, although Allen is not entitled to recover for loss of the election, we hold that he is entitled to recover damages for injury to his political reputation. *See* Southwestern Publishing Co. v. Horsey, 230 F.2d 319 (9th Cir. 1956); Houston Printing Co. v. Hunter, 105 S.W.2d 312 (Tex.Civ.App. 1937), aff'd, 106 S.W.2d 1043 (Tex. 1937); Jenkins v. Taylor, 4 S.W.2d 656 (Tex.Civ.App. 1928). This view is consistent with the Restatement comment which extends slander *per se* to cover candidates for political office.

Hernstadt claims that, assuming Allen did prove any general damages, the award of $675,000 was excessive and unconstitutional. The award represents approximately 1/10 of Hernstadt's net worth; this suggests that the jury intended to punish Hernstadt. He asks this court to disallow or reduce the award because it appears to have been given under the influence of passion or prejudice. NRCP 59(a)(6).

Several courts have expressed concern that an award of substantial damages in cases of this kind may impinge on first amendment rights if compensatory damages are employed as a vehicle for punishing unpopular ideas. For that reason, a few jurisidictions have eliminated punitive damages altogether in defamation actions; others have imposed a stricter scrutiny in reviewing jury awards for actual damages. *See* Kidder v. Anderson, 345 So.2d 922 (La.App. 1977), rev'd, 354 So.2d 1306 (La. 1978), *cert. denied,* 439 U.S. 829 (1978); Stone v. Essex County Newspapers, Inc., 330 N.E.2d 161 (Mass. 1975). The United States Supreme Court has not yet held presumed damages or punitive damages unconstitutional so long as "actual malice" is established and has in fact stated that an award need not be limited to out-of-pocket damages. The award must be supported by competent evidence, though not necessarily of the kind that "assigns an actual dollar value to the injury." *Gertz,* above, at 349-50. Some courts apparently have read *Gertz* as authorization to apply a traditionally deferential approach in reviewing defamation awards. *See,* R. Sack, above, at 356. We are of the opinion that in a public figure slander case against media defendants added scrutiny must be given to large compensatory damage awards because of their impact on free speech. As stated in *Gertz:*

Juries [in defamation cases] may award substantial sums

as compensation for supposed damage to reputation without any proof that such harm actually occurred. The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms.

418 U.S. 349.

We find the potential for inhibiting the vigorous exercise of First Amendment freedom in this case because the damage award far exceeds any conceivable damage that might have been done to Allen's political reputation or damages suffered as a result of an humiliation or mental suffering brought about by the defamatory material presented in this case.

The parties cite a variety of cases on the issue of damages. Hernstadt relies primarily on the Carol Burnett case (Burnett v. National Enquirer, 7 Media L. Rptr. 1331) and Joseph Alioto case (Alioto v. Cowles Communications, Inc., above) to establish the excessiveness of damages in the immediate case. A jury awarded Carol Burnett $300,000 in compensatory damages, of which $299,750 were awarded for emotional distress. The trial judge reduced the compensatory damages to $50,000, but also added $750,000 in punitive damages. Joseph Alioto's suit was tried to the bench; he received general damages in the amount of $350,000. (The amount of the award was not reviewed on appeal.) Hernstadt argues that Allen was entitled, as a matter of law, to less than these plaintiffs received. We agree.

Reduction of the Carol Burnett compensatory damages from $300,000 to $50,000 is very much in line with the views of this court. It is simply beyond the range of reason to conclude that Allen suffered $675,000 damage to his reputation and sensibilities. We conclude that the award is not supported by the evidence and therefore must have been given under the influence of passion or prejudice. We further conclude that an award of this kind and magnitude may constitute a threat to the exercise of free speech. For these reasons we hold that the sum of $50,000 is the maximum amount that could be reasonably awarded under these circumstances. Because damages are excessive the judgment will be set aside and a new trial will be ordered on the issue of damages, unless Allen files within fifteen days of the date of filing of this opinion a remittitur damna in which all amounts over $50,000 are remitted. In the

event of such remission the judgment will be affirmed. *See* Miller v. Schnitzer, 78 Nev. 301, 371 P.2d 824 (1962).

MANOUKIAN, C. J., MOWBRAY and GUNDERSON, JJ., and FONDI, D. J.,[10] concur.

---

APPENDIX TO OPINION OF THE COURT

The following partial transcript is taken from Plaintiff's Exhibit No. 3 included in the record on appeal:

ANNOUNCER: Welcome to TV-5's Political Open House, whereby candidates for various offices on tomorrow's Nevada primary election ballot speak out live.

. . . .

Now here's your host and moderator.

HERNSTADT: Political Open House. . . . So as a public service, and this is our sixth consecutive year, we are very pleased, as a Channel 5 presentation to bring this to you.

ALLEN: Disclosure of campaign contributions before the primary is the only way the voters will know to whom their candidates are indebted. I have made my disclosure to prove that I owe nothing to any special interest group, except you, the voters of Nevada. The candidates who refuse to disclose their contributions are ignoring the voters' right to know. Tomorrow, vote for Bill Allen for action, for Governor.

HERNSTADT: Ah, Mr. Allen, did you have some difficulty in raising funds for your campaign?

ALLEN: Ah . . . no difficulty, my campaign is mostly self-financed. Ah . . . I've had a few small contributions from close friends. Ah . . . nothing over $200.00.

HERNSTADT: The . . . reason I ask that question is that, ah, one of your checks for political advertising for $697.00 was returned to, to this television station, "Refer to Maker" and we called the bank and we found that check wouldn't clear today. Do you have any explanation for that?

ALLEN: My check?

HERNSTADT: · Your check. Golden West Advertising Agency. (ALLEN ALSO: Golden West).

---

[10]The Governor designated the Honorable Michael E. Fondi, Judge of the First Judicial District Court, to sit in the place of JUSTICE THOMAS L. STEFFEN, who voluntarily disqualified himself. Nev. Const., art. 6, § 4.

ALLEN: Well, that . . . that is not my check. That is an advertising agency, I have nothing to do with that check.

DAVIS: We have a question here Mr. Allen. First, I'd like to ask you, number one: by and large it would seem to me an office as important as Governor, generally the participants in seeking that particular office have had some other political background. Do you indeed have that?

. . . .

HERNSTADT: Okay. Thank you very much Mr. Bill Allen who is running for Governor of the State of Nevada as Republican.

. . . .

HERNSTADT: Okay. Thank you very much Mort Block, candidate for Sheriff as a Democrat. Our next candidate is Senator Jack Schofield.

. . . .

DAVIS: Thank you Senator Schofield. Jack Schofield running on the Democratic ticket for Governor. We have several questions for you, Senator. . . .

. . . .

COMMERCIAL

HERNSTADT: Hi, we're back with Candidate's Open House tonight. I'm Bill Hernstadt.

JUDITH HERNSTADT: I'm Judith Hernstadt.

HERNSTADT: And before we go on with questions for Senator Schofield, ah, I did get a demand, from, from one of Mr. Allen's representatives that we apologize for questioning him about the bounced check. I wish to point out that while it was an agency check, from his agency . . . (garbled) . . . ah, giving an agency authority to act on that candidate's behalf. Now if that agency, ah, fails to pay the candidate's bills then the candidate is legally (and morally responsible) . . . (garbled) . . . but this is why it was brought up. But I did want to tell you that they had made that request. And, ah, the question of course, that obviously comes to mind that another viewer called in is, if the candidate doesn't pay his political bills, what is he going to do with State money? But getting back to an honorable candidate, Senator Schofield, ah, how do you feel ah, are you for or against the right to work law?