JOSEPH J. BONGIOVI, JR., M.D., AND JOSEPH J. BONGIOVI, JR., M.D., CHARTERED, APPELLANTS, *v.* WALTER SULLIVAN, M.D., RESPONDENT.

No. 43194

July 13, 2006

138 P.3d 433

*Beckley Singleton, Chtd.*, and *Daniel F. Polsenberg*, Las Vegas; *Parker Nelson & Arin, Chtd.*, and *Imanuel B. Arin*, Las Vegas; *JoNell Thomas*, Las Vegas, for Appellants.

*Campbell & Williams* and *Donald J. Campbell* and *J. Colby Williams*, Las Vegas, for Respondent.

Before ROSE, C. J., DOUGLAS and BECKER, JJ.

# OPINION

By the Court, ROSE, C. J.:

Julie Jones sought cosmetic surgery and consulted with various plastic surgeons, including appellant Joseph Bongiovi, Jr., M.D., and respondent Walter Sullivan, M.D. On two separate occasions, while Jones was consulting with Bongiovi, Bongiovi told Jones that Sullivan had recently killed a woman while performing the same surgery Jones was scheduled for. Jones canceled her surgery with Sullivan and, sometime later, told Sullivan what Bongiovi had said.

Sullivan sued Bongiovi for defamation, arguing that Bongiovi's statements were slanderous per se. Following a trial, the jury found in favor of Sullivan and awarded him $250,000 in compensatory damages and $250,000 in punitive damages. Bongiovi appeals, arguing that a new trial is warranted because the district court (1) abused its discretion by refusing to continue the trial to accommodate Bongiovi's counsel's medical condition, (2) erred by concluding that Sullivan was not a limited-purpose public figure, and (3) improperly allowed inflammatory hearsay testimony. Bongiovi also argues, among other things, that the damages awards must be set aside because (1) the compensatory damages award was excessive, and the district court erroneously awarded prejudgment interest on future damages; and (2) the punitive damages award was improper because Sullivan failed to prove that Bongiovi's statements were made with the requisite malice, fraud, or oppression to support punitive damages, and the award was excessive and improperly based on attorney fees.

We conclude that a new trial is unwarranted and the compensatory and punitive damages awards were proper. Regarding the denial of the request for a trial continuance, Bongiovi was adequately represented by other counsel, the district court delayed the start of trial by one week to allow Bongiovi's substitute counsel to familiarize himself with the case, and Bongiovi has not demonstrated that he was prejudiced by the denial. Thus, the district court did not abuse its discretion by denying his request. Regarding whether Sullivan was a limited-purpose public figure, Sullivan did not voluntarily interject himself into a public controversy, and therefore, the district court properly concluded that he was not a limited-purpose public figure. As to the evidentiary objections, the district court did not improperly allow hearsay or inflammatory testimony. And finally, with regard to the damages awards, Bongiovi has not demonstrated that there was error in either the compensatory or

punitive damages awards. Consequently, we affirm the district court's judgment.

## FACTS

Jones was an exotic dancer in Las Vegas, Nevada, who sought plastic surgery to enhance her appearance and improve her ability to earn money in her profession. Prior to having surgery, Jones consulted with various doctors, including Bongiovi and Sullivan. During Jones's consultation with Bongiovi, she told him that she had previously consulted with Sullivan at Sullivan's Estetica surgery center. Bongiovi then told Jones that Sullivan had a patient die the week before during the same surgery that Jones was having. Jones questioned Bongiovi about whether the death was the anesthesiologist's or Sullivan's fault. Bongiovi confirmed that it was Sullivan's negligence that led to the patient bleeding to death on his table.

Bongiovi also told Jones that Bongiovi was the chief of staff at a hospital and was a consultant for a board of examiners that was investigating Sullivan's misconduct in connection with the patient's death. No one other than Jones's infant child was present when these statements were made. Bongiovi's statements that Sullivan had a patient die, that Bongiovi was a consultant for a board of examiners, and that Sullivan was being investigated were false.

Following that visit, Jones had a consultation at Nevada Plastic Surgery, but she did not know the name of the plastic surgeon whom she would be seeing. The plastic surgeon turned out to be Sullivan. Jones had always liked Sullivan, and his office then scheduled her for surgery. Jones did not reveal Bongiovi's statements to Sullivan at that time. Jones also had another appointment with Bongiovi, which she kept. Jones's boyfriend went with Jones to her appointment with Bongiovi. Jones questioned Bongiovi about what he previously told her about Sullivan, and Bongiovi confirmed to her that the statements were true. Jones was scared by what Bongiovi told her, so she decided to have Bongiovi, and not Sullivan, perform her surgery. Both Jones and her then-boyfriend also testified that Bongiovi agreed to reduce his price, although he still charged more than Sullivan. They testified that the price reduction also influenced Jones's decision to cancel the surgery with Sullivan.

When Jones canceled her surgery with Sullivan, she told his office manager, Jamie Wallin, that she was canceling because Sullivan was under investigation for a patient's death.[1] Wallin then informed Sullivan that Jones said that Sullivan had killed someone

---

[1] Wallin also testified that, several days after she initially canceled surgery, Jones called and said that she wanted to cancel surgery because she was planning to have a baby with her husband.

and was under investigation. Wallin testified that when Sullivan learned of the statements he was outraged, yelled, screamed, and demanded Jones's telephone number.

Sullivan then called Jones, and Jones told Sullivan that she was told that he had murdered a patient. Jones refused to reveal the name of the doctor who had made those statements to her. Jones testified that Sullivan was upset, and he asked Jones to tell whoever made the statements to stop. After speaking with Sullivan, Jones then called Bongiovi's office, again seeking confirmation of the statements, and Bongiovi's office assistant confirmed that the statements were true.

### Conversation with attorney Kim Mandelbaum

After speaking with Jones, Sullivan telephoned attorney Kim Mandelbaum, who had previously represented him and who had given him advice over the years. Sullivan wanted advice from Mandelbaum about how he could get the name of the doctor who made the statements. Mandelbaum testified that Sullivan was very upset. Mandelbaum told Sullivan that he should request Jones's medical records from Bongiovi because, in her experience, Bongiovi had usually had a consultation with the majority of plastic surgery patients. Mandelbaum also testified that she had no personal knowledge that Bongiovi ever made a derogatory statement against Sullivan.

Sullivan then faxed a request for Jones's medical records to Bongiovi's office to verify whether Bongiovi had seen Jones. Sullivan did not receive any records. However, he later received a telephone message from Bongiovi's office that Jones had been in for a consultation but had not had any work done and there were no records.

Jones ultimately had surgery with Bongiovi. Following the procedure, Jones had multiple complaints regarding the surgery and was unhappy with the result. Jones went to Sullivan for an evaluation of whether Bongiovi had "botched" her surgery. During that evaluation, Jones told Sullivan that Bongiovi was the doctor who had made the derogatory statements to her. Sullivan then instituted the defamation case against Bongiovi.

### Bongiovi's request for continuance

The night before trial was set to begin, Imanuel Arin, Bongiovi's counsel, was hospitalized for heart problems. Theodore Parker, Arin's law partner, appeared before the district court on the day trial was scheduled to begin and requested a continuance of trial until Arin could recover. None of the other attorneys in Arin's law firm was available to take Arin's place at trial.

After reviewing the file, the district court found that it would take Parker only two days to get up to speed on the case. The district court stated that Paul Acker, an associate at Arin's law firm who had signed the majority of the pleadings and taken many of the depositions in the case, was competent and could effectively assist Parker in presenting the case and bringing him up to speed. The district court partially granted Parker's request and continued the trial for seven days, three less than what Parker indicated he would be amenable to. It was the fourth time the trial had been continued, twice at Parker's request.

Parker was unable to prepare for the trial in time, and on the Friday before trial, the district court received an ex parte faxed letter from Parker requesting another continuance. The district court informed Parker that it would not consider a motion for continuance sent by facsimile. On the morning that trial was set to begin, Parker moved to withdraw as Bongiovi's counsel, stating that he was unable to prepare for trial. The district court concluded that it could not consider the motion because an application to withdraw may not be granted if it would delay trial.[2] The district court denied Parker's request and ordered that trial would begin the following day. Although Parker conducted the majority of the trial, Arin delivered the opening statement, cross-examined Jones, and engaged in colloquy with the district court.

*Challenges to trial testimony*

Also prior to trial, Bongiovi filed a motion in limine to exclude hearsay testimony, requesting that the testimony of various doctors and Mandelbaum be precluded at trial. Bongiovi argued that the witnesses' testimony was irrelevant and they had no personal knowledge of his statements to Jones about Sullivan. Therefore, he contended that the testimony must be excluded under NRS 48.025(2), which states, "Evidence which is not relevant is not admissible." He also argued that the testimony was hearsay and should be excluded under NRS 51.065, the general rule excluding hearsay from evidence. Finally, he argued that the testimony was character evidence that must be excluded because, under NRS 50.085(3), extrinsic evidence could not be used to impeach.

Sullivan argued that the testimony demonstrated that Bongiovi did not mistakenly, but intentionally made the remark about Sullivan and that it was relevant because it demonstrated that Bongiovi engaged in a chronic practice of disparaging fellow surgeons/competitors to gain an economic advantage. The district court granted Bongiovi's motion to exclude the doctors' testimony. However, the district court allowed attorney Mandelbaum to testify

---

[2]EDCR 7.40(c).

as to her conversation with Sullivan about how to discover the source of the statements. After Mandelbaum testified, Bongiovi moved for a mistrial. The district court ruled that Mandelbaum's testimony had been appropriately limited and that her testimony was introduced because there was evidence that a question existed as to why Sullivan faxed the request for Jones's records to Bongiovi's office.

The district court also permitted Jody Smiley, Bongiovi's receptionist and office manager six years prior to the defamation incident, and Marie Hamilton, Ph.D., who worked for Bongiovi for two years, to testify. Smiley and Hamilton testified that Bongiovi had previously made disparaging and/or racist remarks against other plastic surgeons and described specific remarks Bongiovi made about various doctors.

### The harm to Sullivan

At trial, Sullivan's office manager, Wallin, testified that after learning of Bongiovi's comments, Sullivan's demeanor changed, and he became more guarded and depressed. She said that he had gone through moments where he was not able to communicate with her or patients and that his communication had become very reserved. Other employees testified similarly.

Sullivan testified that he could not quantify loss of patients or business resulting from the statements, but that he had seen a decrease in patients who work as exotic dancers. He said that he had suffered mentally and emotionally. He testified that it was an assault—a horrible memory that affected his practice and how he related to patients, as well as his interpersonal relationships. Sullivan also testified, however, that no other doctors had told him that they thought he was less competent because of the statements, nor had any other doctors told Sullivan that they would not refer patients to him because of the statements. Mrs. Sullivan testified that since the incident, there had been a "pall" over their life and that the incident was an undercurrent that was always there. She testified that although Sullivan's personality had not changed, they were both devastated. Finally, during the punitive damages phase of the trial, Sullivan testified that he had incurred nearly $244,000 in attorney fees. Although the district court did not preclude Sullivan from introducing that testimony, the court expressly refused to instruct the jury that it could consider attorney fees when awarding punitive damages.

### Sullivan's testimony about Mrs. Sullivan

During Bongiovi's cross-examination of Sullivan, he asked Sullivan many specific questions about why Sullivan did not speak

with Mrs. Sullivan about the alleged defamatory statements and about why she was not dealing with the situation along with him. Sullivan responded that Bongiovi did not ''want [Sullivan] to go there.'' On redirect examination, Sullivan testified that the reason that he did not discuss the case with his wife was because his wife had medical problems. He also testified that the previous day someone from Bongiovi's office had terrorized her while trying to serve her with a subpoena. Bongiovi objected, and the district court struck Sullivan's statement regarding service.

Sullivan then explained that his wife had suffered a traumatic brain injury, and she nearly died. Although she had recovered well, she became easily stressed, so he tried not to stress her. Bongiovi objected, but the district court overruled the objection because Bongiovi had opened the door by asking Sullivan during cross-examination why Sullivan did not discuss the case with his wife.

### Sullivan's professional accomplishments—limited-purpose public figure

Sullivan testified at length about his accomplished career. He testified that he had a national reputation as a skilled and caring plastic surgeon, went to the top-rated medical school in the country, was trained at the top-rated plastic surgery school in the country, part of his training was at the leading cosmetic surgery hospital in the country, where he later became chief and ran the residency program, was selected for a prestigious fellowship, was Chief of Plastic Reconstructive Surgery of Wayne State University's Children's Hospital of Michigan, had published numerous articles and abstracts, contributed to chapters in books and textbooks, and belonged to specialized medical groups. He traveled to Nepal and Africa on his own expense to provide medical care. He was the subject of newspaper articles because of a surgery performed on an infant. Other doctors testified that Sullivan had a national reputation and was prominent in the plastic surgery field.

Bongiovi argued that Sullivan's accomplishments made him a limited-purpose public figure, entitling Bongiovi to an actual malice instruction. The district court held that, as a matter of law, Sullivan was not a limited-purpose public figure and denied an actual malice instruction.

### The verdict

The jury found in favor of Sullivan, and although Sullivan asked for $1 million in compensatory damages, it awarded him $250,000 in compensatory damages. The district court then found that, as a matter of law, Sullivan was entitled to punitive damages. Sullivan

presented evidence that Bongiovi's net worth was approximately $2,560,000,[3] while Bongiovi calculated his net worth at $971,656. Sullivan asked for $500,000 in punitive damages, but the jury awarded him $250,000 in punitive damages. The district court entered prejudgment interest on the entire compensatory damages award. The district court then entered judgment on the jury verdict. Bongiovi appeals, arguing that he is entitled to a new trial because the district court abused its discretion by (1) denying his request for a continuance, (2) determining that Sullivan was not a limited-purpose public figure, and (3) admitting impermissible evidence. Bongiovi also argues that the damages awards must be set aside because (1) the compensatory damages award was excessive and the district court improperly awarded prejudgment interest on the entire amount; and (2) the punitive damages award was improper because Sullivan failed to prove that Bongiovi acted with malice, fraud, or oppression and the award was excessive and improperly based on the jury's consideration of Sullivan's attorney fees.

## DISCUSSION

*The district court did not abuse its discretion when it denied Bongiovi's request to continue trial because of his attorney's medical condition*

Bongiovi argues that the district court abused its discretion by denying his motion to continue the trial because of attorney Arin's medical condition.[4] He contends that attorney Parker was not given adequate time to prepare, which prejudiced his trial.[5] We disagree.

---

[3]This figure represented a net worth of $2,948,513.43, minus an outstanding loan obligation of $380,000.

[4]Although the district court granted Bongiovi's motion in part by giving him a one-week extension for Parker to prepare for trial, Bongiovi had requested a longer extension, and therefore, for ease of discussion, we refer to the district court's decision as a denial of Bongiovi's request to continue.

[5]Bongiovi also argues that the district court abused its discretion by refusing to consider his faxed request to continue the trial. We disagree. Generally, a faxed letter is insufficient under the rules to support a request for continuance. *See Moore v. Cherry*, 90 Nev. 390, 394, 528 P.2d 1018, 1021 (1974) (when requesting a continuance, "[a]n *ex parte* letter to the . . . district judge will not do"); *Dodd v. Cowgill*, 85 Nev. 705, 712, 463 P.2d 482, 484 (1969) (stating that a telegram "could hardly be construed" as meeting practice requirements). Parker became aware of his need for an additional continuance on the Thursday before the Monday trial start date. As Sullivan correctly asserts, Parker then had time to prepare an affidavit, as demonstrated by the fact that he was able to draft and fax a letter to the district court requesting a continuance. Further, Parker prepared a motion to withdraw, which he brought to the start of trial, again indicating a sufficient amount of time to draft an affidavit. Thus, we conclude that the district court did not abuse its discretion by refusing to entertain Bongiovi's faxed letter requesting a continuance.

We review the district court's decision on a motion for continuance for an abuse of discretion.[6] Generally, an attorney's illness is good grounds for a continuance.[7] And when that attorney has not been dilatory in conducting his case, the district court's denial of a continuance may be an abuse of discretion.[8] However, denial of a motion to continue based on an attorney's illness is proper when "the party whose attorney is ill is represented by other counsel"[9] or the attorney's absence is not prejudicial to the client.[10] We conclude that denial of the motion to continue was not an abuse of discretion because Bongiovi was both represented by other counsel and the denial was not prejudicial.[11]

The party seeking a continuance is considered "well represented" by other counsel when, for instance, the other counsel has prepared and signed pleadings and conducted a portion of the case during the first part of the trial.[12] Additionally, when co-counsel

---

Additionally, Bongiovi contends that Parker's motion to withdraw was also a renewed motion to continue. We conclude that this contention is without merit because, at the hearing on Parker's motion to withdraw, Parker made expressly clear that he was not seeking a continuance but was seeking to withdraw from the case.

Finally, Bongiovi also argues in his reply brief that the district court erred by not considering Parker's motion to withdraw. Bongiovi did not raise this issue in his opening brief, and because reply briefs are limited to answering any matter set forth in the opposing brief, NRAP 28(c), we decline to consider this argument.

[6]*Dodd*, 85 Nev. at 711, 463 P.2d at 486.

[7]*Hernandez v. Superior Court*, 9 Cal. Rptr. 3d 821, 825-26 (Ct. App. 2004); *Lopez v. Lopez*, 689 So. 2d 1218, 1219 (Fla. Dist. Ct. App. 1997); *In re Marriage of Ward*, 668 N.E.2d 149, 154 (Ill. App. Ct. 1996).

[8]*Summerfield v. Coca Cola Bottling Co.*, 113 Nev. 1291, 1294, 948 P.2d 704, 705-06 (1997). *Summerfield*, unlike the instant case, was decided in the context of summary judgment and the fact that the proceedings were in the early stages was relevant to this court's conclusion that it was an abuse of discretion to grant summary judgment after the party had requested a continuance. *See id.*

[9]*Dodd*, 85 Nev. at 712, 463 P.2d at 487; *see also Geotech Energy Corp. v. Gulf States*, 788 S.W.2d 386, 391 (Tex. Ct. App. 1990).

[10]*See Matthews v. Matthews*, 220 So. 2d 246, 248 (La. Ct. App. 1969).

[11]In addition, Sullivan points out that, at the time of Bongiovi's request, the trial had already been continued four times, twice at Bongiovi's request. Denial of a motion to continue may be proper when the party has previously received a continuance. *See Dodd*, 85 Nev. at 711, 463 P.2d at 486.

[12]*Dodd*, 85 Nev. at 710-13, 463 P.2d at 486-87.

has conducted much of the discovery, it is not an abuse of discretion to deny a motion to continue because lead counsel is ill.[13] Here, Parker is an experienced trial attorney, and Acker prepared many of the pleadings and conducted much of the discovery, including taking depositions. Parker was given one week to prepare for trial, and Acker was well versed in the case and had done much of the trial preparation. Also, Arin was able to deliver the opening statement, cross-examine Jones, and engage in colloquy with the court. Therefore, we conclude that Bongiovi was adequately represented by other counsel.[14]

Nevertheless, Bongiovi argues that he was not adequately represented because "lawyers are not fungible."[15] Although the case Bongiovi cites, *Oliveros v. County of Los Angeles*, provides support for his position that attorneys are not interchangeable, it is distinguishable from the instant situation, and therefore it is not wholly persuasive in resolving this issue. Important in *Oliveros* was that the case was an extremely complicated medical malpractice case with many expert and lay witnesses, trial was projected to last nearly three weeks, substantial damages were at stake, and none of the other lawyers in the attorney's office with experience to try the case were available.[16] To the contrary, the instant case was far less complex and the trial was not scheduled to last nearly as long as in *Oliveros*. Most importantly, Parker, an experienced trial attorney, with Acker's assistance, was available and able to try the case. Thus, we conclude that Bongiovi was adequately represented.

*The district court did not abuse its discretion by determining that Sullivan was not a limited-purpose public figure*

Bongiovi argues that because Sullivan testified that he was well-known, highly regarded, and had a national reputation as a plastic surgeon, Sullivan was a limited-purpose public figure for speech concerning his role as a plastic surgeon. Thus, Bongiovi argues that the jury instructions should have included instructions on actual malice. We disagree.

---

[13]*Geotech Energy Corp.*, 788 S.W.2d at 391.

[14]The parties argue at length regarding whether Acker could have tried the case. The district court did not base its decision on whether Acker could try the case but, rather, on the fact that Parker would be trying the case, with Acker available to "get him up to speed." And, in fact, Acker did not try the case. Therefore, it is irrelevant whether Acker could have tried the case and unnecessary for us to address this issue.

[15]*Oliveros v. County of Los Angeles*, 16 Cal. Rptr. 3d 638, 644 (Ct. App. 2004).

[16]*Id.* at 641, 644.

Whether a plaintiff is a limited-purpose public figure is a question of law,[17] which we review de novo.[18] "A limited-purpose public figure is a person who voluntarily injects himself or is thrust into a particular public controversy or public concern, and thereby becomes a public figure for a limited range of issues."[19] Whether a person becomes a public figure depends on whether the person's role in a matter of public concern is voluntary and prominent. This is determined by examining the " 'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.' "[20]

Once the plaintiff is deemed a limited-purpose public figure, the plaintiff bears the burden of proving that the defamatory statement[21] was made with actual malice, rather than mere negligence.[22] This is to ensure that speech that involves matters of public concern enjoys appropriate constitutional protection. In contrast, speech not involving matters of public concern holds reduced constitutional value and damages can be awarded absent a showing of actual malice.[23] There is no public issue when the speech is "solely in the individual interest of the speaker and [the speaker's] specific . . . audience."[24] Additionally, no special protection is warranted when "the speech is wholly false and clearly damaging to the victim's business reputation."[25]

We have not yet addressed whether a doctor can be considered a limited-purpose public figure for speech concerning his medical expertise; although we have previously held that a restaurant, which is a place of public accommodation, "voluntarily inject[s] itself into the public concern for the limited purpose of reporting on its goods and services" and therefore is a limited-purpose public

---

[17]*Schwartz v. American College of Emergency Phys.*, 215 F.3d 1140, 1145 (10th Cir. 2000).

[18]*Canfora v. Coast Hotels & Casinos, Inc.*, 121 Nev. 771, 775, 121 P.3d 599, 602 (2005).

[19]*Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 720, 57 P.3d 82, 91 (2002).

[20]*Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974)).

[21]The parties have not raised an issue with regard to the general elements of a defamation claim. Therefore, we need not address this issue. For a list of the elements of a defamation claim, *see id.* at 718, 57 P.3d at 90.

[22]*Id.* at 721, 57 P.3d at 92.

[23]*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774-75 (1986).

[24]*Dun & Bradstreet, Inc. v. Greenmoss Builders*, 472 U.S. 749, 762 (1985).

[25]*Id.*

figure for the purpose of a food review reporting on its services.[26] Bongiovi cites to this language and contends that in addition to Sullivan's excellent credentials, he is a limited-purpose public figure because, just like a restaurant, Sullivan voluntarily entered the public spectrum by providing public services and seeking public patrons.

Other courts have addressed this issue and generally conclude that a doctor is not ordinarily considered a public figure.[27] However, doctors have been held to be *limited-purpose* public figures for a particular issue when they have voluntarily come to the forefront of a national or local debate concerning that medical issue or have "affirmatively step[ped] outside of their private realms of practice to attract public attention."[28] Coming to the forefront of a debate has included behavior such as: writing letters to politicians and hiring a private lobbyist and public relations agent,[29] authoring articles in national magazines and appearing on national television shows,[30] testifying before an FDA panel,[31] and "writing [letters] to newspapers, professional journals and organizations, fellow physicians, and government officials" regarding an issue.[32]

In contrast, a small minority of courts has held that doctors are limited-purpose public figures regardless of whether they have come to the forefront of a debate or a particular issue because the qualifications of doctors are matters of vital importance to the public,[33] or because the doctors have advertised in the yellow pages and received clientele from throughout the United States because of their expertise.[34]

Consistent with the majority of courts, we conclude that a doctor is not a limited-purpose public figure unless that doctor voluntarily comes to the forefront of a national or local debate concern-

---

[26]*Pegasus*, 118 Nev. at 721, 57 P.3d at 92.

[27]*Park v. Capital Cities Communications*, 585 N.Y.S.2d 902, 905 (App. Div. 1992) (stating that "a physician would not ordinarily be considered a public figure"); *Sparagon v. Native American Publishers*, 542 N.W.2d 125, 135 (S.D. 1996) (same).

[28]*Sparagon*, 542 N.W.2d at 135.

[29]*Gaunt v. Pittaway*, 534 S.E.2d 660, 665-66 (N.C. Ct. App. 2000).

[30]*Schwartz v. American College of Emergency Phys.*, 215 F.3d 1140, 1143-45 (10th Cir. 2000).

[31]*McBride v. Merrell Dow and Pharmaceuticals Inc.*, 717 F.2d 1460, 1466 (D.C. Cir. 1983).

[32]*State ex rel. Suriano v. Gaughan*, 480 S.E.2d 548, 558-59 (W. Va. 1996).

[33]*Korbar v. Hite*, 357 N.E.2d 135, 139 (Ill. App. Ct. 1976).

[34]*Martinez v. Soignier*, 570 So. 2d 23, 27-28 (La. Ct. App. 1990).

ing medical issues or has "affirmatively step[ped] outside of [his] private realm[ ] of practice to attract public attention."[35] We conclude that Sullivan's professional achievements are insufficient to render him a limited-purpose public figure. Also, he did not voluntarily thrust himself into a public controversy. Further, Bongiovi's statements did not concern a public controversy or issue and were made solely in the individual interest of himself and Jones. Bongiovi's speech was wholly false and damaging to Sullivan's business reputation, and because Sullivan is not a public figure and the speech was not a matter of public concern, Bongiovi's speech is entitled to no special protection. Lastly, distinguishable from the newspaper in *Pegasus v. Reno Newspapers, Inc.*,[36] Bongiovi is not a media defendant reporting on the goods and services of a place of public accommodation. Accordingly, we conclude that the district court properly determined that Sullivan was not a limited-purpose public figure and properly denied an actual malice instruction.

### *The district court did not abuse its discretion by admitting inflammatory evidence*

Bongiovi argues that the judgment must be set aside and a new trial ordered because Sullivan introduced impermissible character evidence. Specifically, Bongiovi challenges the testimony of attorney Mandelbaum, Bongiovi's former employees, Smiley and Hamilton, and Sullivan's testimony regarding Mrs. Sullivan's physical health and the statement that she was terrorized while Bongiovi's office was serving a subpoena. Bongiovi argues that this testimony is character evidence, impermissibly introduced to prove conduct in conformity therewith. He also argues that even if the evidence was admissible, its prejudicial effect outweighed the probative value.[37] We disagree.

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."[38] However, it may "be admissible for other

---

[35]*Sparagon v. Native American Publishers*, 542 N.W.2d 125, 135 (S.D. 1996).

[36]118 Nev. 706, 57 P.3d 82.

[37]Bongiovi also contends that this evidence is hearsay. However, the statements were not offered to prove the truth of the matter asserted and, therefore, are not hearsay. NRS 51.035 (" 'Hearsay' means a statement offered in evidence to prove the truth of the matter asserted . . . ."). Further, as Sullivan points out, some of these statements are Bongiovi's own statements being used against him and are not hearsay. NRS 51.035(3)(a).

[38]NRS 48.045(2).

purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.''[39] Before admitting prior bad act evidence, the district court must determine whether the evidence is relevant and proven by clear and convincing evidence.[40] Additionally, the evidence is inadmissible ''if its probative value is substantially outweighed by the danger of unfair prejudice.''[41] The district court's determination is given great deference, and we will not reverse the district court's decision absent manifest error.[42] Thus, an error in the admission of evidence is not grounds for a new trial or for setting aside a verdict unless the error is inconsistent with substantial justice.[43]

Mandelbaum's testimony was unrelated to Bongiovi's character. Also, although she testified that she told Sullivan that Bongiovi consulted with the majority of plastic surgery patients, the statement was not offered on its truth, but rather to show its effect on Sullivan, *i.e.*, that it motivated Sullivan to request Jones's records from Bongiovi's office. Thus as Mandelbaum's testimony was neither impermissible character evidence nor hearsay, it was admissible. Further, we conclude that any prejudicial effect the testimony might have had was outweighed by its probative value, and the district court did not abuse its discretion by admitting Mandelbaum's testimony.

Regarding Smiley's and Hamilton's testimony concerning other disparaging or defamatory remarks Bongiovi allegedly made about other doctors, Sullivan correctly argues that the statements were introduced to show Bongiovi's mental state, such as motive or intent.[44] Smiley's and Hamilton's testimony demonstrated that Bongiovi intentionally made the defamatory remark to Jones. Thus, the testimony was proper under NRS 48.045(2). Also, although not argued by the parties, Smiley's and Hamilton's testimony demonstrated that the defamatory remark about Sullivan was not a mis-

---

[39]*Id.*

[40]*Taylor v. Thunder*, 116 Nev. 968, 973, 13 P.3d 43, 46 (2000).

[41]NRS 48.035(1); *see also Taylor*, 116 Nev. at 973, 13 P.3d at 46.

[42]*Taylor*, 116 Nev. at 973, 13 P.3d at 46.

[43]NRCP 61.

[44]It appears that the district court allowed this testimony as proving that Bongiovi had a habit of disparaging or defaming other physicians. We conclude that the district court erred in determining that these other instances demonstrated a habit. However, we will affirm the district court's decision if it reaches the right result, even if for the wrong reasons. *Sengel v. IGT*, 116 Nev. 565, 570, 2 P.3d 258, 261 (2000).

take or an accident, again making the testimony proper under NRS 48.045(2).[45]

Finally, regarding Sullivan's testimony concerning Mrs. Sullivan's physical condition, Bongiovi, on cross-examination, asked Sullivan three times to explain why Sullivan did not discuss the case with Mrs. Sullivan. Thus, because Bongiovi asked Sullivan this question during his cross-examination, it was proper for Sullivan's counsel to address this issue with Sullivan on redirect. Therefore, we conclude that the district court did not abuse its discretion by admitting this testimony and by determining that it was within the scope of Bongiovi's cross-examination. Regarding the service of the subpoena, Bongiovi objected to that testimony, and the district court sustained the objection and struck the testimony. Thus, we conclude that any error was properly cured and that it did not amount to manifest error requiring a new trial.

### *The compensatory damages award was proper*

The jury awarded Sullivan $250,000 in compensatory damages, and the district court awarded Sullivan prejudgment interest on the entire award. Bongiovi challenges the award, arguing that it is excessive and that the district court improperly awarded prejudgment interest on the entire amount because the award included future damages.[46]

Bongiovi argues that the $250,000 compensatory damages award was excessive because the evidence demonstrated that Bongiovi's statement was only made to Jones and her then-boyfriend, Sullivan could only prove the loss of Jones's surgery, Sullivan's reputation was not harmed, and his hurt feelings and mortification were not so severe as to require medical attention or cause the loss of work

---

[45]Sullivan also argued that the testimony was admissible because it was introduced to support the malice element of punitive damages, an issue we have not yet addressed. As we conclude that the testimony was admissible on other grounds, we do not address this issue.

[46]Bongiovi also argues that the verdict was a result of passion or prejudice based on Sullivan's attorney's misconduct during closing argument. However, Bongiovi did not object to Sullivan's attorney's closing arguments in either the liability or the punitive damages phases of the trial. It is a "requirement in civil cases that counsel timely and specifically object to instances of improper argument to preserve an issue for appeal." *Ringle v. Bruton*, 120 Nev. 82, 95, 86 P.3d 1032, 1040 (2004). We will review unobjected-to misconduct only when "it is plain and clear that no other reasonable explanation for the verdict exists." *Id.* at 96, 86 P.3d at 1041. Based on the evidence, we cannot conclude that Sullivan's attorney's comments during closing arguments were the only reasonable explanation for the verdict. Accordingly, we conclude that Bongiovi's challenge is without merit.

and other activities. Bongiovi contends that the jury "essentially awarded Dr. Sullivan $250,000 in damages for what was, if anything, little more than wounded feelings and embarrassment associated with hearing about Dr. Bongiovi's alleged comments." We disagree.

Bongiovi's defamatory statement about Sullivan's surgical skills was slander per se, which is an oral statement "which would tend to injure the plaintiff in his or her trade, business, profession or office."[47] With slander per se, the plaintiff is entitled to presumed, general damages.[48] General damages are those that are awarded for "loss of reputation, shame, mortification and hurt feelings."[49] General damages are presumed upon proof of the defamation alone because that proof establishes that there was an injury that damaged plaintiff's reputation and " 'because of the impossibility of affixing an exact monetary amount for present and future injury to the plaintiff's reputation, wounded feelings and humiliation, loss of business, and any consequential physical illness or pain.' "[50] We will affirm an award of compensatory damages unless the award is so excessive that it appears to have been given under the influence of passion or prejudice.[51]

However, an award of presumed general damages must still be supported by competent evidence but "not necessarily of the kind that 'assigns an actual dollar value to the injury.' "[52] Courts are cautious when reviewing large compensatory damage awards in defamation cases because of the potential for an unsupported jury verdict, which could potentially impact First Amendment freedoms.[53] Thus, in reviewing awards for excessiveness, courts look to how offensive the slanderous remark was, whether it was believed,

---

[47]*Nevada Ind. Broadcasting v. Allen*, 99 Nev. 404, 409, 664 P.2d 337, 341 (1983).

[48]*See K-Mart Corporation v. Washington*, 109 Nev. 1180, 1192, 866 P.2d 274, 282 (1993), *receded from on other grounds by Pope v. Motel 6*, 121 Nev. 307, 114 P.3d 277 (2005); *Nevada Ind. Broadcasting*, 99 Nev. at 409, 664 P.2d at 341.

[49]NRS 41.334; *see also Nevada Ind. Broadcasting*, 99 Nev. at 417, 664 P.2d at 346.

[50]*K-Mart Corporation*, 109 Nev. at 1195, 866 P.2d at 284 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 373 n.4 (1974) (White, J., dissenting)).

[51]*Guaranty Nat'l Ins. Co. v. Potter*, 112 Nev. 199, 206, 912 P.2d 267, 272 (1996) (quoting NRCP 59(a)(6)).

[52]*Nevada Ind. Broadcasting*, 99 Nev. at 418, 664 P.2d at 347 (quoting *Gertz*, 418 U.S. at 350).

[53]*Id.* at 418-19, 664 P.2d at 346-47.

how widely it was disseminated, and the plaintiff's prominence and professional standing in the community.[54]

Sullivan argues that the statement at issue was especially egregious because it was a deliberate falsehood aimed at the heart of Sullivan's trade. He notes that, importantly, patients seeking plastic surgeons tend to "shop around" when choosing a plastic surgeon, as did Jones, and eighty percent of his business is word-of-mouth. And, according to Sullivan, the largest clientele for cosmetic surgery is exotic dancers, among whom rumors are rife. Thus, he contends that Bongiovi's statement was one of the most damaging things that could have been said about a cosmetic surgeon.

Jones also repeated the statement to others, including her boyfriend, mother, and best friend. Sullivan testified that his clientele of exotic dancers diminished since Bongiovi's statement. Sullivan also testified that the incident had a profound emotional impact on him. His coworkers testified that after the incident he was withdrawn, moody, and guarded.

Bongiovi, however, asserts that $50,000 is the most that can ever be awarded in a slander per se case. He bases his assertion on *Nevada Independent Broadcasting v. Allen*, a slander per se case, where we reduced a compensatory damages award of $675,000 to $50,000 because $50,000 was "the maximum amount that could be reasonably awarded under these circumstances."[55]

Bongiovi's assertion is incorrect. In *Nevada Independent Broadcasting*, we reduced the award because of the specific circumstances of that case. Most importantly, unlike the instant case, *Nevada Independent Broadcasting* involved a media defendant, and accordingly, First Amendment concerns were at the forefront of our concern in reviewing the damages award. We said, "We find the potential for inhibiting the vigorous exercise of First Amendment freedom in this case because the damage award far exceeds any conceivable damage that might have been done."[56] We also stated that the award was not supported by the evidence.[57] Finally, *Nevada Independent Broadcasting* was decided in 1983, when $675,000 and $50,000 had much greater value than they do today.[58] We conclude that the compensatory damages award was supported

---

[54]*Ingber v. Ross*, 479 A.2d 1256, 1265 (D.C. 1984).

[55]99 Nev. at 419, 664 P.2d at 347.

[56]*Id.*

[57]*Id.*

[58]Bongiovi also cited to various decisions of other courts where the compensatory damages awards were reduced. The cases Bongiovi cited are distinguishable from the case at bar and therefore unpersuasive.

by evidence that Sullivan was emotionally injured and also suffered an incalculable loss of business. Sullivan asked for $1 million in compensatory damages, but the jury only awarded one-fourth of that amount. Thus, we conclude that the compensatory damages award was not excessive.

### *The district court did not err by awarding prejudgment interest on the entire verdict*

Bongiovi challenges the district court's award of prejudgment interest on the entire verdict because the jury awarded a general verdict, which did not distinguish between present and future damages. Bongiovi contends that the jury awarded Sullivan future damages because it was instructed on future damages and Sullivan's counsel asked for future damages in his closing argument. We disagree.

We review challenges to prejudgment interest for error.[59] A "judgment draws interest from the time of service of the summons and complaint until satisfied, except for any amount representing future damages."[60] Thus, it is error to award prejudgment interest on an entire verdict if "it is impossible to determine what part of the verdict represented past damages."[61] But when there is nothing in the record to suggest that future damages were included in the award, prejudgment interest on the verdict is allowed.[62] "The jury is presumed to have based its verdict solely on the evidence presented," and when there is no reference to future damages in evidence, "it is logical to conclude that the jury did not base its verdict on future damages."[63] Thus, even when a jury instruction expressly allows the jury to consider future damages, if the record does not indicate any reference to future damages in evidence, prejudgment interest awarded on the entire verdict is proper.[64]

The jury instruction Bongiovi challenges states, "Damages are presumed in slander *per se* actions because of the impossibility of

---

[59]*See Hazelwood v. Harrah's*, 109 Nev. 1005, 1011, 862 P.2d 1189, 1192 (1993), *overruled in part on other grounds by Vinci v. Las Vegas Sands*, 115 Nev. 243, 984 P.2d 750 (1999).

[60]NRS 17.130(2).

[61]*Hazelwood*, 109 Nev. at 1011, 862 P.2d at 1192; *see also Stickler v. Quilici*, 98 Nev. 595, 597, 655 P.2d 527, 528 (1982) (concluding that when a jury returned a general verdict in a personal injury case, that verdict was insufficient to demonstrate the amount of past damages).

[62]*Hazelwood*, 109 Nev. at 1011, 862 P.2d at 1192; *Farmers Home Mutual Ins. v. Fiscus*, 102 Nev. 371, 375, 725 P.2d 234, 236 (1986).

[63]*Hazelwood*, 109 Nev. at 1011, 862 P.2d at 1193.

[64]*Id.*

affixing an exact monetary amount for present and future injury to the plaintiff's reputation, wounded feelings and humiliation, loss of business and any consequential physical illness or pain." The portion of closing argument Bongiovi challenges was when Sullivan's attorney stated that Sullivan would remember every day what Bongiovi did and that Sullivan's life would never be the same.

However, in addition to the challenged instruction, the jury was also instructed that, "A slanderous communication constitutes slander per se if it would tend to injure the plaintiff in his trade, business, profession or office," and "If you find defendant['s] remarks defamatory and if you further find these statements injured plaintiff's business or profession, then damages are presumed."

We conclude that the district court did not err in its prejudgment interest award. Other than the jury instruction Bongiovi challenges, which merely describes the nature of a slander per se case and why damages are presumed, the other jury instructions concerning a damages award refer only to past damages. Sullivan's attorney's statements during closing argument that Sullivan would never forget what happened and that his life would forever be different are not evidence of future damages.[65] Bongiovi points to nothing in the record that shows that the jury otherwise received evidence of future damages. Thus, because the jury is presumed to award damages based on the evidence presented and there was no evidence regarding future damages, we conclude that the district court did not err by awarding Sullivan prejudgment interest on the entire compensatory damages verdict.

*The punitive damages award was not error*

Punitive damages are designed not to compensate the plaintiff for harm suffered but, instead, to punish and deter the defendant's culpable conduct.[66] "Punitive damages provide a means by which the community . . . can express community outrage or distaste for the misconduct of an oppressive, fraudulent or malicious defendant and by which others may be deterred and warned that such conduct will not be tolerated."[67] Bongiovi argues that the $250,000 punitive damages award was error because Sullivan failed to prove that Bongiovi's statements were made with malice, fraud, or oppres-

---

[65]*See Klein v. State*, 105 Nev. 880, 884, 784 P.2d 970, 972 (1989) (stating that the prosecutors comments were not improper because he reminded the jury that it had been instructed that "nothing counsel might say during the trial was to be considered as evidence in the case").

[66]*Ace Truck v. Kahn*, 103 Nev. 503, 506, 746 P.2d 132, 134 (1987).

[67]*Id.*

sion, and the award was excessive and improperly based on attorney fees. We conclude that these assertions are without merit.

### *Sullivan sufficiently proved malice, fraud, or oppression*

A plaintiff is not automatically entitled to punitive damages.[68] Instead, punitive damages may be awarded when the plaintiff proves by clear and convincing evidence that the defendant is "guilty of oppression, fraud or malice, express or implied."[69] " 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person."[70] " 'Fraud' means an intentional misrepresentation, deception or concealment of a material fact known to the person with the intent to deprive another person of his rights or property or to otherwise injure another person."[71] " '[E]xpress malice' is 'conduct which is intended to injure a person'; 'implied malice' is 'despicable conduct which is engaged in with a conscious disregard of the rights . . . of others.' "[72]

The district court has discretion to determine whether the defendant's conduct merits punitive damages as a matter of law,[73] and we will not overturn an award of punitive damages if it is supported by substantial evidence of oppression, fraud, or malice.[74] "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion."[75] We also " 'assume that the jury believed all the evidence favorable to the prevailing party and drew all *reasonable* inferences in [that party's] favor.' "[76]

Although Bongiovi argues that Sullivan failed to prove that the statements were made with malice, fraud, or oppression, his bald

---

[68]*Dillard Department Stores v. Beckwith*, 115 Nev. 372, 380, 989 P.2d 882, 887 (1999).

[69]NRS 42.005(1).

[70]NRS 42.001(4).

[71]NRS 42.001(2).

[72]*Clark v. Lubritz*, 113 Nev. 1089, 1099, 944 P.2d 861, 867 (1997) (alteration in original) (quoting NRS 42.001(3)).

[73]*Evans v. Dean Witter Reynolds, Inc.*, 116 Nev. 598, 612, 5 P.3d 1043, 1052 (2000).

[74]*Id.*

[75]*First Interstate Bank v. Jafbros Auto Body*, 106 Nev. 54, 56, 787 P.2d 765, 767 (1990) (internal quotation marks and citation omitted).

[76]*Id.* (alteration in original) (quoting *Paulin v. Sutton*, 102 Nev. 421, 423, 724 P.2d 749, 750 (1986)).

assertion is not developed into an argument, nor supported with any citations to the record. Accordingly, we conclude that, because of the nature of the statements and the circumstances under which they were made, there was sufficient evidence that Bongiovi made the statements with malice, fraud, or oppression.

### The punitive damages award was not excessive

With regard to reviewing punitive damage awards for excessiveness, our standard of review under state law differs slightly from the standard of review under the Fourteenth Amendment. Nevada's standard for reviewing excessiveness of a punitive damage award is that "[p]unitive damages are legally excessive when the amount of damages awarded is *clearly* disproportionate to the degree of blameworthiness and harmfulness inherent in the oppressive, fraudulent or malicious misconduct of the tortfeasor under the circumstances of a given case."[77] The focus is on what is fair, just, and reasonable, according to the ordinary meaning of those terms.[78] The relevant considerations are "the financial position of the defendant, culpability and blameworthiness of the tortfeasor, vulnerability and injury suffered by the offended party, the extent to which the punished conduct offends the public's sense of justice and propriety, and the means which are judged necessary to deter future misconduct of this kind."[79]

Although states have discretion over the imposition of punitive damages, the Due Process Clause of the Fourteenth Amendment prohibits grossly excessive or arbitrary punitive damage awards.[80] To protect against grossly excessive or arbitrary awards, the United States Supreme Court has fashioned three guideposts for deciding when a punitive damage award has violated due process. The three considerations are (1) "the degree of reprehensibility of the defendant's conduct,"[81] (2) the ratio of the punitive damage award to the "actual harm inflicted on the plaintiff,"[82] and (3) how the punitive damages award compares to other civil or criminal penalties "that could be imposed for comparable misconduct."[83] "[C]ourts must ensure that the measure of punishment is both reasonable and

---

[77]*Ace Truck v. Kahn*, 103 Nev. 503, 509, 746 P.2d 132, 136-37 (1987) (footnote omitted).

[78]*Id.* at 510, 746 P.2d at 137.

[79]*Id.*

[80]*State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408, 416-18 (2003).

[81]*BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996).

[82]*Id.* at 580.

[83]*Id.* at 583.

proportionate to the amount of harm to the plaintiff and to the general damages recovered."[84] Appellate courts review these guideposts de novo.[85]

The United States Supreme Court announced the due process standard of review for punitive damage awards in 1996, but we have not yet had an opportunity to examine an award of punitive damages according to the new federal standard. Although Nevada's standard for excessiveness varies only slightly from the federal standard, its variation makes it necessary to analyze a punitive damages award under both standards because there may be instances where an award would not be deemed excessive under Nevada's standard but would nonetheless violate a litigant's due process rights, or vice versa. Therefore, in the interest of judicial economy and because the standards are similar, we conclude that Nevada's standard for excessiveness should be replaced with the federal standard for excessiveness. By adopting the federal standard in Nevada, the necessity for both a state and federal review for excessiveness is obviated. Accordingly, the proper standard for reviewing excessiveness of a punitive damages award in Nevada is the federal standard's three guideposts previously stated.

Applying the three guideposts here, first, Bongiovi's conduct was reprehensible to a large degree because of the egregiousness and offensiveness of his statements about Sullivan. Second, the amount of punitive damages was representative of the harm that Sullivan suffered because there was evidence to show that Sullivan suffered great emotional harm and lost business. Third, Sullivan asked for $500,000 in punitive damages, and the jury could have permissibly awarded him $750,000 in punitive damages.[86] However, the jury awarded Sullivan $250,000—one-half of what he asked for, one-third of what it could have awarded, and the same as the general damages award. Therefore, we conclude that the punitive damages award was not excessive because it is both "reasonable and proportionate to the amount of harm" to Sullivan and to the compensatory damages award.

---

[84]*State Farm Mut. Automobile Ins. Co.*, 538 U.S. at 426.

[85]*Id.* at 418.

[86]NRS 42.005(1)(a). Bongiovi also incorrectly compared the punitive damages award to the criminal punishment and fine available under the criminal libel statute, NRS 200.510, as supporting that the punitive damages award was excessive. First, the speech at issue in the instant case is slander, which is different from the type of defamation NRS 200.510 punishes. Thus, Bongiovi's conduct is not criminally punishable under NRS 200.510. Second, although NRS 200.510 provides for a smaller monetary punishment than was awarded in this case, we conclude that being criminally charged, convicted, and/or incarcerated far outweighs any monetary penalty.

Finally, Bongiovi argues that because Sullivan testified to the amount of attorney fees he had incurred as a result of this litigation, the jury improperly considered his attorney fees when awarding him punitive damages. However, it is not improper for a jury to receive evidence of attorney fees in reference to a punitive damages award.[87] Also, the district court expressly declined to instruct the jury that it could consider attorney fees and costs when awarding punitive damages, and we presume that the jury followed the district court's instructions.[88] Therefore, we conclude that the punitive damages award was not rendered improper by Sullivan's testimony regarding his attorney fees.

## CONCLUSION

For the foregoing reasons, we conclude that Bongiovi is not entitled to a new trial and that the compensatory and punitive damage awards were proper. Accordingly, we affirm the district court's judgment.

DOUGLAS and BECKER, JJ., concur.

---

[87]*St. Luke Church v. Smith*, 568 A.2d 35, 40-41 & n.7, 42 (Md. 1990) (stating that the majority of courts that have considered this issue permit the jury to consider evidence of attorney fees in awarding punitive damages) (citing *Markey v. Santangelo*, 485 A.2d 1305 (Conn. 1985); *Umphrey v. Sprinkel*, 682 P.2d 1247 (Idaho 1983); *Newton v. Hornblower, Inc.*, 582 P.2d 1136 (Kan. 1978); *Central Bank of Mississippi v. Butler*, 517 So. 2d 507 (Miss. 1987); *Senn v. Manchester Bank of St. Louis*, 583 S.W.2d 119 (Mo. 1979), *disavowed on other grounds by Haarmann v. Davis*, 651 S.W.2d 134 (Mo. 1983); *Hofer v. Lavender*, 679 S.W.2d 470 (Tex. 1984); *DeBry & Hilton Travel v. Capitol Intern. Airways*, 583 P.2d 1181 (Utah 1978); *Olds v. Hosford*, 354 P.2d 947 (Wyo. 1960)).

[88]*Krause Inc. v. Little*, 117 Nev. 929, 937, 34 P.3d 566, 571 (2001).