In re SPECTRUM GOLF, INC., Debtor.

Spectrum Golf, Inc., Plaintiff,

v.

Robert A. Chiti, Defendant.

Bankruptcy No. 02–15894–PHX–SSC.
Adversary No. 02–1422.

United States Bankruptcy Court,
D. Arizona.

Sept. 22, 2006.

Michael W. Carmel, Michael W. Carmel, Ltd., Phoenix, AZ, for Debtor/Plaintiff.

## MEMORANDUM DECISION

SARAH SHARER CURLEY,
Bankruptcy Judge.

### I. Preliminary Statement

The Court bifurcated the trial in this adversary proceeding after reviewing the statutory and case law, determining that Nevada law applied to the controversy between the parties, and concluding that Nevada law required a separate hearing to assess the amount of punitive damages once liability had been determined. The parties are referred to this Court's Memorandum Decision, dated February 21, 2006, and this Court's clarification of that Decision as stated on the record on May 9, 2006, for a determination of the liability of Mr. Robert Chiti and the reasons therefor. Those Decisions are incorporated herein by reference and made a part of this Decision. On July 14, 2006, Mr. Chiti filed a Motion to Strike the testimony and report of Mr. Greco and a memorandum of law in support of the Defendant's position. On July 14, 2006 and July 24, 2006, respectively, the Debtor filed a memorandum of law in support of the reorganized Debtor's position and a response in opposition to the Motion to Strike.[1] This Decision shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52, Bankruptcy Rule 7052. The Court has jurisdiction over this matter pursuant to the consent of the parties to enter final orders in this adversary. 28 U.S.C. § 157(b)(2)(A) and (O).[2]

### II. Factual Discussion

#### A. General Discussion.

Mr. Davin Dameron testified that he currently worked with Mr. Chiti at Open-Tech and had previously worked with Mr. Chiti and Mr. Greco at Spectrum Golf from 1999 to 2005. He testified that he enjoyed working with Mr. Chiti and trusted him. He noted that everyone working at Spectrum was very aware of Spectrum having filed a bankruptcy petition and, as a result, their jobs might be eliminated. Mr. Greco, from time to time, talked about the ongoing proceedings in the bankruptcy court. Mr. Dameron testified

---

1. Defendant's counsel actually filed a pleading entitled "Defendant's Motion in Limine." However, since such a motion is normally presented to the Court "before or during a trial," the Court will consider the Motion as a

Motion to Strike. *Blacks Law Dictionary,* 802 (Bryan A. Garner, 8th ed., West 2004)

2. *See* Memorandum Decision dated February 21, 2006.

that at one point, Mr. Greco became concerned that Mr. Chiti was providing information to, or advising, the Debtor's general unsecured creditors' committee as to what action it should take. Mr. Dameron stated that Mr. Greco had advised the Debtor's employees that he intended to sue Mr. Chiti for tortious interference with the Debtor's contracts or business operations. Other than testifying as to a stressful environment which probably occurs at most businesses when they file Chapter 11 proceedings, it is difficult for this Court to determine the relevance of such testimony.

Mr. Michael Connolly testified that he had first met Mr. Chiti in the late 1980's, had kept in contact with him, and had worked with Mr. Chiti on various projects over the years. He is now in business with Mr. Chiti at OpenTech, and while Mr. Chiti is the Chief Executive Officer and a member of the Board, Mr. Connolly is the Executive Vice President of Corporate Development. Mr. Connolly is also on the Board of Directors and holds about a 10 percent stockholder interest in OpenTech. He noted that Mr. Chiti was a good friend, a confidant, and he trusted in his abilities.

Mr. Chiti testified that OpenTech had a patent, but it had not been mentioned in a press release nor touted. He noted that OpenTech was a start-up operation, having opened in 2003. He stated that the salary that he drew from OpenTech was minimal, having received $50,000 in salary in the last year.[3] He noted that he had a net worth of only $60,659.29, but he also placed no value on his OpenTech stock. He testified, in a self-serving manner, that he had learned from his mistakes at Spectrum. He had taken master of business administration classes, had picked "the

right people" to help him start OpenTech, had carefully reviewed the accounting practices to be employed, and had regular Board Meetings at which minutes were taken. He believed that he had "run into difficulties at the Debtor," because he had trusted people, rather than doing his own due diligence. He felt that he was being punished for doing what he thought was right at the time.

The cross examination of Mr. Chiti reflected a far different picture. Mr. Chiti conceded that he had sold product of his new company in an area where there was no sales person and had "paid himself a commission." Moreover, Mr. Chiti maintained a spreadsheet on the commissions that he earned, and he wrote and signed the checks to pay himself. These actions were taken by him irrespective of the fact that OpenTech had a treasurer at the time of the transactions. Mr. Chiti conceded that he prepared his own expense reimbursements, that there were no internal controls for the officers, and that although at least one deposit account at OpenTech required a dual signature to disburse funds, no dual signature was required on the officers' expense account. Quite simply Mr. Chiti could write a check for an improper reimbursement, and no one would know.[4] Despite Mr. Chiti's efforts to portray a man who had learned from his mistakes, the Court came to a very different conclusion. Mr. Chiti had not learned his lesson. He was still acting improperly although a fiduciary, with no adequate controls in place, at his new Company, Open-Tech.

As to the value of his shareholder interest, Mr. Chiti conceded that there had been 15 to 18 separate purchases of Open-

---

3. *See* Exhibit KK.

4. Mr. Chiti conceded that although an operations manager did do a reconciliation of the accounts, that manager had no access to the checks.

Tech stock by 15 separate individuals over the last 12 months. All of the shares sold for 35 cents a share. Such testimony indicated that there was a market, albeit for private investors, in the stock.

B. *The Value of Mr. Chiti's interest in OpenTech Alliance, Inc.*

■ The reorganized Debtor called Mr. Damian J. Greco as its expert witness to value Mr. Chiti's interest in OpenTech Alliance, Inc. Mr. Chiti's counsel challenged the ability of Mr. Greco to testify as an expert witness in this matter, and subsequently filed a Motion to Strike. First, Mr. Greco has no professional credentials to appraise businesses or any interest therein. He is not a member of one of the appraisal societies, and he is not familiar with the Uniform Standards of Professional Appraisers. Second, Mr. Greco has not participated in any formal programs to remain current on the methodology, ethics, and the best practices in appraising a business or an interest in a business. Third, Mr. Greco has not been qualified as an expert witness in any court proceedings. Fourth, given Mr. Greco's current duties as Chief Executive Officer of Golf Switch and the reorganized Debtor, his impartiality as an expert witness could reasonably be questioned. Fifth, Mr. Greco does not use any of the standard approaches to value in valuing Open Tech.

However, Mr. Greco did receive a Masters in Business Administration from New York University in 1971, specializing in corporate finance and securities analysis. Mr. Greco did testify that he had 35 years of experience in valuing or appraising businesses and that during that time he had "appraised 1,000 to 2,000 businesses." He noted that he used a practical approach to valuing businesses. Although Mr. Greco's Background Summary reflects the analysis of various operations for management for purposes of acquisitions or initial public offerings or the analysis of financial operations to implement a credit policy or budget for various divisions, the Court does not see any experience which relates to Mr. Greco's appraising a business for third parties.[5] He testified that in appraising Mr. Chiti's interest in OpenTech, he used a "theoretical and practical approach to valuation."

■ The Court agrees, based upon the Defendant's Motion to Strike, that Mr. Greco's testimony as an expert witness shall be disregarded by this Court. This Court must act as a gatekeeper to determine whether expert testimony should be admitted under Fed. R. Evidence 702. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The United States Supreme Court decision of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) sets out the standards for the federal court to determine whether a particular individual should be allowed to testify as an expert in the scientific area. The four guiding factors laid out by the Supreme Court in *Daubert* are the following: 1) whether the underlying method can be or has been tested; 2) whether the method has been subject to peer review and publication; 3) the method's known or potential error rate; and 4) the level of the method's acceptance within the relevant discipline. Ultimately the Court should not allow an individual to testify as an expert in a trial unless the matter is such that an expert is required to assist the trier of fact in analyzing complex matters. If the matter is such that it requires an expert, the expert must pass a rigorous test that considers the four factors set forth in *Daubert*

5. *See* Exhibit 5.

As was described by the Defendant's expert witness, Mr. Greco used a "practical rule of thumb" to appraise the OpenTech stock which had not been tested by any other appraiser for accuracy. Mr. Greco did not refer to any treatise, article, association, or other group of business valuation experts which had reviewed and published particular findings as to the method utilized by Mr. Greco. Moreover, given that OpenTech was a start-up business, Mr. Greco's analysis of value predicated on sales, even though the business was still incurring operational losses, seemed particularly prone to error. Mr. Greco's approach was not an accepted method of valuing a shareholder interest in a start-up entity that has been tested or relied upon in the valuation community. Thus, none of the four factors has been shown by Mr. Greco.

The Court's reaction is that although Mr. Greco understands financial matters, he should not be qualified as an expert in business valuation. The ability to review profit and loss statements, balance sheets, and cash flow statements does not translate into an ability to value a stock interest in a start-up technology company. Moreover, Mr. Greco is the Chief Executive Officer of the reorganized Debtor. Depending on his analysis of this matter, the reorganized Debtor will benefit from his analysis. In essence, Mr. Greco is not the traditional disinterested appraiser.

■ Even if the Court's conclusion is incorrect, and Mr. Greco should be considered an expert in the area of business valuation, the Court has a number of problems with Mr. Greco's report which requires the Court to give it very little weight.[6] First, Mr. Greco concedes that he has limited data upon which to rely.[7] Next, he has presented information upon which he heavily relies which is not supported by any data. For instance, he estimates that the sales of OpenTech will increase from $699,546 in actual sales at the end of 2005 to estimated sales of $1,400,000 by the end of 2006.[8] He states at one point in his report: "Assuming the accelerated growth pattern continues, which based upon the number of installations, is consistent with quarter over quarter results, the 2006 annualized sales should at least double over prior years results."[9] However, OpenTech mostly likely has competitors, and if the market has become saturated or competitive, there is no guarantee that the sales will increase exponentially as described. Mr. Greco also notes that the Company has not "broken even" in its operations indicating that its start-up expenses may have been substantial. Again, there is no analysis concerning the expenses, and what those expenses may be if sales increase so dramatically. At another point in his report, he concedes that OpenTech is still reflecting a loss from operations. He then states that given "the development requirements and marketing penetration demands," which require substantial overhead, OpenTech is performing in a typical manner.[10] He states "the losses do not affect the valuation criteria."[11] However, the losses may have a tremendous impact on the value of a start-up operation, if the company has insufficient capital. Such a scenario could lead to a rapid collapse of the company and cause the shareholder interest to have little value. Mr. Greco also

---

6. *See* Exhibit 6.

7. Mr. Greco testified that he received limited data from OpenTech approximately 10 days prior to the start of this trial.

8. *See* Exhibit 6 at 1.

9. *Id.*

10. *Id.* at 2.

11. *Id.*

relies only on the projected sales, or multiples thereof, as the basis to value Open-Tech. He then states, in a conclusory manner, that 3 times the "annualized sales" is a representative low end of fair value. In this case, the sales are grossly overestimated. So, how is any value based upon such a factor reliable? The Court rejects Mr. Greco's conclusion that Mr. Chiti's ownership interest in OpenTech has a value of $972,400. As to the Defendant's Motion to Strike, the Court concludes that Mr. Greco is not an expert and his report should be stricken from the record. Even if the Court is incorrect on the Motion to Strike, for the reasons stated by the Court, Mr. Greco's testimony and report should be given little weight.

■ Mr. Chiti called Mr. Michael Gilburd as his expert witness. Mr. Gilburd had numerous degrees and licenses, had participated in, or taught, numerous national seminars or courses, had prepared reports for litigation, and had testified as an expert in business valuation.[12] Moreover, he had been retained in various cases to value the interest of minority shareholders.[13] He testified that he has completed several thousand business valuations. Based upon his experience, educational level, and licenses and degrees, the Court concludes that he is an expert in business valuation.

Mr. Gilburd testified that he was familiar with the industry in which OpenTech operated. He also noted that he was an independent appraiser, having no connection to Mr. Chiti, this litigation, or Open-Tech and that he considered the traditional three approaches to value in appraising the Company. Of the asset, income, and market (sales) approach to value, Mr. Gilburd testified that he utilized two methods

from the asset approach, and one from the market approach in valuing the Company. He noted that since OpenTech was still losing money from its operations, he did not believe it was appropriate to use the income approach. He testified that he had reviewed the patents that OpenTech had obtained, but he concluded that said patents, through the asset and market approach to value, did not appreciably add to the value of OpenTech. Mr. Gilburd concluded that although Mr. Chiti had warrants for the issuance of stock to him at a later date, those warrants did not affect the value of Mr. Chiti's interest. Mr. Gilburd arrived at an initial fair market value of $1,030,631. Mr. Chiti's interest, thus, had an initial value of $222,616.[14] Mr. Gilburd then noted that Mr. Chiti's minority interest would be difficult to sell—even to a private investor, and that decisions could be made by management which would not benefit this interest. He discounted Mr. Chiti's interest by 30 percent for this "lack of control." Mr. Gilburd then opined that there was no accepted market for such a minority interest in a start-up company and discounted Mr. Chiti's interest further. Mr. Gilburd concluded that Mr. Chiti's interest in OpenTech had a value of $120,727.

■ The Court has concerns about Mr. Gilburd's valuation. Although the Court may question Mr. Gilburd's liquidation analysis, Mr. Gilburd's determination that Mr. Chiti's warrants are worthless, and that the discount for lack of control is excessive given Mr. Chiti's executive level and Board position with OpenTech, the Court concludes that the valuation is far too low. Mr. Gilburd conceded that there had been a recent sale of stock by another

---

12. *See* Exhibit P.

13. *Id.*

14. The parties agreed on the extent of Mr. Chiti's fractional shareholder interest in OpenTech. $1,030,631 × Mr. Chiti's 21.6% interest = $222,616.

individual not in control of OpenTech at a value of 35 cents per share. Moreover, Mr. Chiti had confirmed that 15 to 18 purchases of the OpenTech stock had occurred, with 15 individuals actually acquiring the stock. Each purchaser paid 35 cents per share. With Mr. Chiti's interest in the Company, that would translate to a stock value for Mr. Chiti of $420,000. Given the excessive discounts by Mr. Gilburd and his failure to take into account Mr. Chiti's management of OpenTech, the warrants that Mr. Chiti had, and the recent purchases of minority interests in Open-Tech, the Court concludes that the value of Mr. Chiti's interest is $420,000, which is the amount of the recent stock sale per share (35 cents) times the number of shares held by Mr. Chiti in OpenTech.

## III. Legal Discussion

### A. Assessment of Punitive Damages

■ In Nevada, punitive damages are authorized by statute. Nevada Revised Statute § 42.005 provides for an award of punitive damages upon a showing of fraud, oppression or malice by clear and convincing evidence.[15] *Wichinsky v. Mosa,* 109 Nev. 84, 847 P.2d 727 (Nev.1993). Furthermore, "conscious disregard" means

---

15. Nev.Rev.Stat. § 42.005 (West 2006) provides:

1. Except as otherwise provided in NRS 42.007, in an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to the compensatory damages, may recover damages for the sake of example and by way of punishing the defendant. Except as otherwise provided in this section or by specific statute, an award of exemplary or punitive damages made pursuant to this section may not exceed:

(a) Three times the amount of compensatory damages awarded to the plaintiff if the amount of compensatory damages is $100,000 or more; or

(b) Three hundred thousand dollars if the amount of compensatory damages awarded to the plaintiff is less than $100,000.

2. The limitations on the amount of an award of exemplary or punitive damages prescribed in subsection 1 do not apply to an action brought against:

(a) A manufacturer, distributor or seller of a defective product; 9

(b) An insurer who acts in bad faith regarding its obligations to provide insurance coverage

(c) A person for violating a state or federal law prohibiting discriminatory housing practices, if the law provides for a remedy of exemplary or punitive damages in excess of the limitations prescribed in subsection 1;

(d) A person for damages or an injury caused by the emission, disposal or spilling of a toxic, radioactive or hazardous material or waste; or

(e) A person for defamation.

3. If punitive damages are claimed pursuant to this section, the trier of fact shall make a finding of whether such damages will be assessed. If such damages are to be assessed, a subsequent proceeding must be conducted before the same trier of fact to determine the amount of such damages to be assessed. The trier of fact shall make a finding of the amount to be assessed according to the provisions of this section. The findings required by this section, if made by a jury, must be made by special verdict along with any other required findings. The jury must not be instructed, or otherwise advised, of the limitations on the amount of an award of punitive damages prescribed in subsection 1.

4. Evidence of the financial condition of the defendant is not admissible for the purpose of determining the amount of punitive damages to be assessed until the commencement of the subsequent proceeding to determine the amount of exemplary or punitive damages to be assessed.

5. For the purposes of an action brought against an insurer who acts in bad faith regarding its obligations to provide insurance coverage, the definitions set forth in NRS 42.001 are not applicable and the corresponding provisions of the common law apply.

knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences. *See Clark v. Lubritz,* 113 Nev. 1089, 944 P.2d 861 (1997) (punitive damages assessed for breach of fiduciary duty).

▪▪▪ Punitive damages are not designed to compensate a party, but are awarded "for the sake of example and by way of punishing the defendant." *Siggelkow v. Phoenix Ins. Co.,* 109 Nev. 42, 846 P.2d 303, 304 (1993). "Punitive damages provide a means by which the community ... can express community outrage or distaste for the misconduct of an oppressive, fraudulent or malicious defendant and by which others may be deterred and warned that such conduct will not be tolerated." *Ace Truck and Equipment Rentals, Inc. v. Kahn,* 103 Nev. 503, 506, 746 P.2d 132 (Nev.1987). The allowance or denial of exemplary or punitive damages rests entirely in the discretion of the trier of fact. *Smith's Food & Drug Cntrs. v. Bellegarde,* 114 Nev. 602, 606, 958 P.2d 1208, 1211 (1998); *Ramada Inns v. Sharp,* 101 Nev. 824, 826, 711 P.2d 1, 2 (1985).

▪▪▪ Nevada law permits the recovery of punitive damages, if there is a breach of fiduciary duty, even though the underlying nature of the agreement between the parties may be contractual. Such a conclusion is predicated on the fact that a breach of fiduciary duty is a separate tort upon which punitive damages may be assessed. *Clark v. Lubritz,* 113 Nev. 1089, 1097, 944 P.2d 861, 867 (1997).

Pursuant to NRS 42.005(3) once a trier of fact makes a determination that punitive damages should be assessed, as this Court did in its prior Memorandum Decision, a "subsequent proceeding" must be conducted to determine the amount of said damages. In making a determination of punitive damages, a judge or a jury looks to the specific factors set forth in *Ace Truck*

*and Equipment Rentals, Inc. v. Kahn,* 103 Nev. 503, 746 P.2d 132 (Nev.1987). Those factors are as follows:

1. Financial position of the Defendant;
2. culpability and blameworthiness of the tortfeasor;
3. vulnerability and injury suffered by the offended party;
4. the extent to which the punished conduct offends the public's sense of justice and propriety; and
5. the means which are judged necessary to deter future misconduct of this kind.

*Ace* at 137.

▪▪▪ The Nevada Supreme Court has recently revised the appropriate test to impose punitive damages under Nevada law. In the decision of *Bongiovi v. Sullivan,* 138 P.3d 433 (Nev.2006), the Court concluded that the factors to be considered under Nevada law varied slightly from the factors to be considered under the 14th Amendment to the United States Constitution to accord a defendant due process of law. *Id.* at 452. Thus, the Court adopted the standards set forth in *BMW of North America, Inc. v. Ira Gore, Jr.,* 517 U.S. 559, 575, 580, 583, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), to obviate the need for a review under both state and federal law to determine the excessiveness of the award. *Id.* Given the recent change in Nevada law, this Court shall apply the factors set forth in *Sullivan* to this matter. In determining whether a punitive damages award is grossly excessive or arbitrary, in violation of due process, the court should consider (1) degree of reprehensibility of defendant's conduct, (2) ratio of punitive damage award to actual harm inflicted on plaintiff, and (3) how the punitive damages award compares to other civil or criminal penalties that could be imposed for comparable misconduct. *Id.* Moreover, in awarding punitive damages, courts must

ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered. *Id.*

■ As the General Manager of Golf Switch, a division of the Debtor, Mr. Chiti was responsible for running the day-to-day operations, including, but not limited to, setting the strategic direction of the company and ensuring that Golf Switch would be the "number one online tee-time provider in North America." The Court found that the nature of Mr. Chiti's trust relationship with the Debtor, and the nature of his obligations and duties, did require a high degree of care on his part, imparting him with the fiduciary duty to act honestly and in good faith to the Debtor. As set forth in the Court's February 21, 2006 Memorandum Decision, Mr. Chiti breached that duty of care by stating to a management level employee, Ms. Klein, and the then President of the Debtor, Mr. Loustalot, that he intended to destroy the Golf Switch Division. Given his background and training, he had the ability to execute and succeed on such a threat. He delayed in booking contracts on the system for the Division which resulted in the Division having cash flow problems shortly before the Debtor filed its bankruptcy petition. Furthermore, he also circulated a memorandum which contained proprietary information to his friends and family without proper Board authorization and without any effort to protect the confidentiality of said information. He was doing this purely for his personal gain: the ability to take over the Golf Switch Division. In light of his leadership role within the company, Mr. Chiti's conduct was absolutely reprehensible. The Court concludes that the degree of reprehensibility of Mr. Chiti's conduct is consistent with an award of punitive damages. Factor 1 of the *Sullivan* test has been met.

■ The Court also notes that the recidivist nature of the defendant's actions may be considered in determining whether Factor 1 has been meet. *BMW of North America, Inc. v. Ira Gore, Jr.*, 517 U.S. 559, 576–577, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Mr. Chiti's testimony on cross examination reflects that he is not performing as a fiduciary for his new company. He has put no effective internal controls in place to prevent him or any other officer from taking improper reimbursements from OpenTech. This type of behavior—a certain sense of entitlement, and a lack of controls, led to his breach of his fiduciary duty to the Debtor. Thus, despite his self-serving testimony, he has not learned his lesson. He is still engaging in the same culpable behavior that he engaged in at the Debtor. The Court is only able to end such conduct by imposing punitive damages.

■ As to Factor 2 of the *Sullivan* test, the United States Supreme Court has cautioned that the ratio of the award of punitive damages to the actual harm inflicted on the plaintiff must be reasonable. *Id.* at 580–581, 116 S.Ct. 1589. However, a court may consider the harm that has actually occurred as well as the *potential harm* to the plaintiff. *Id.* at 581–582, 116 S.Ct. 1589. There is no simple mathematical formula in determining an appropriate award, even when the court is considering the potential harm to the plaintiff. *Id.* at 582–583, 116 S.Ct. 1589. Indeed the United States Supreme Court noted:

> ... low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have

been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once again, "we return to what we said ⋯ in *Haslip:* 'We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that [a] general concer[n] of reasonableness ⋯ properly enter[s] into the constitutional calculus.' " [*TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443] *Id.*, at 458, 113 S.Ct. [2711], at 2720[, 125 L.Ed.2d 366 (1993)] (quoting [*Pacific Mutual Life Ins. Co. v.*] *Haslip*, 499 U.S. [1], at 18, 111 S.Ct. [1032], at 1043[, 113 L.Ed.2d 1]).

*BMW* at 583, 116 S.Ct. 1589.

In this case, the potential for harm to the Debtor was high. If Mr. Chiti had eviscerated the Golf Switch Division's reservation system, continued to delay in the booking of contracts for the Division, and continued to circulate a confidential memorandum outlining the Debtor's finances to third parties, he could have destroyed the Debtor's operations or potentially acquired the Golf Switch Division and the Debtor at consideration substantially below the market price but for his actions. From the Court's standpoint, a multiple of 4 of the actual damages assessed in this matter is reasonable. Hence, the Court concludes that $5,500 times 4 or $22,000 is an appropriate award of punitive damages.

The final *Sullivan* factor, how the punitive damage award compares to other civil or criminal penalties, has also been met. In this case, Nevada has set forth a statutory framework for the imposition of punitive damages. Such a framework ensures that conduct which is criminal, which would accord a defendant more constitutional protections, is not being used as a basis or measure of the punitive damages to be assessed. Moreover, Nevada law

sets a statutory maximum of $300,000 on the award of punitive damages in a matter such as this. This Court's award of $22,000 in punitive damages is consistent with the carefully crafted Nevada statute.

### B. *Choice of Law*

 The Defendant appears to assert, once again, a choice of law argument in his post-trial brief. The Court has previously set forth its analysis as to why a breach of fiduciary duty must be analyzed and resolved based upon the law of the state of incorporation of the entity, not where the alleged defalcations occurred. To the extent that the Defendant now relies on the decision of *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) in support of his argument, he is incorrect. The problem in *BMW* was that a court in one state was attempting to assess damages for an action which occurred in another state which was not unlawful in the latter state.

In this case, the state of incorporation, Nevada, has a paramount interest in ensuring that the officers and directors of the corporations which are incorporated in that state adhere to the fiduciary duties as outlined under Nevada law. Given the internal dynamics of the dispute between Mr. Chiti and the Debtor, the state of Arizona has no interest in controlling or regulating the fiduciary obligations of the officers and directors to each other and the corporation. The *BMW* case simply is inapplicable to the facts and law of this case. The Court shall continue to apply the law of Nevada to this controversy.

### IV. *Conclusion*

Based upon the foregoing, the Court shall assess a punitive damage award of $22,000, which Mr. Chiti shall pay to the reorganized Debtor.

The Court grants the Defendant's Motion to Strike the testimony and report of Mr. Greco.

The Court shall execute a separate Order incorporating this Decision.